Ernest P. Raum et al. *v.* The Board of Supervisors of Tredyffrin Township and Intervenors Richard J. Fox et al. Richard J. Fox et al., Appellants.

Appeal of Ernest P. Raum et al. *v.* Zoning Hearing Board of Tredyffrin Township and Intervenors Richard J. Fox et al. Richard J. Fox et al., Appellants.

Main Line Housing Improvement Corporation, a Non-Profit Corporation, et al., Appellants *v.* The Zoning Hearing Board of Tredyffrin Township and Tredyffrin Township, Appellees.

Argued December 7, 1976, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, MENCER, ROGERS and BLATT. Judge WILKINSON, JR. did not participate.

*Richard L. Bazelon,* with him, of counsel, *Dilworth, Paxson, Kalish & Levy,* for Richard J. Fox. et al.

*Lawrence E. Wood,* for Ernest P. Raum, et al.

*William H. Lamb,* with him *E. Craig Kalemjian,* and *Lamb, Windle & McErlane,* for Tredyffrin Township.

OPINION BY JUDGE CRUMLISH, JR., February 24, 1977:

Presently before this Court is the Petition of Richard J. Fox, Greenview Associates and Picket Post Village, Inc. (Fox), seeking an order enforcing judgment previously entered sustaining the validity of zoning of certain tracts owned by Fox in Tredyffrin Township commonly referred to as the Chesterbrook tracts. Our opinion sustaining the validity of that zoning is reported as *Raum v. Board of Supervisors of Tredyffrin Township,* 20 Pa. Commonwealth Ct. 426, 342 A.2d 450 (1975). In that opinion, this Court validated the Township's amending of its comprehensive plan to designate a 1,000 acre portion of the Township as a Unified Development Area (U.D.A.) which resulted in an ordinance being passed implementing the U.D.A. concept with respect to lands owned by Fox. Timely appeal by local residents and a citizens group named Citizens Organized to Reclaim Chesterbrook (CORC) was taken to the Court of Common Pleas of Chester County, which reversed the zoning board and invalidated the ordinance. We, in turn, reversed the court below and validated the zoning as applicable to Fox. After our opinion was filed, a

petition for allocatur was filed in the Supreme Court and subsequently denied, finalizing our decree of the validity of the zoning of Chesterbrook.

Immediately following the denial of allocatur, the Township commenced what this Court views as a deliberate attempt to thwart the letter and spirit of our validation of the Fox zoning by unjustified refusals to grant certain permits, the enactment of harsh and unreasonable fee schedules pointed to Fox's development of the Chesterbrook tract, purposeful delays in acting upon applications for development submitted by Fox, and intimidation by advertising rezoning of Chesterbrook immediately following the Supreme Court's denial of allocatur. All of these actions are accurately described in both the Petition for Order to Enforce Judgment and the Supplement thereto, and the Township's and CORC's answers in response.

The Township's defense of these allegations of noncompliance with our prior order has been well presented by its solicitor, and essentially resolves to one of averring legitimate disputes in interpretation of ordinances and reasonable actions by the Board of Supervisors in exercise of their police power to insure effective planning and proper adherence to standards of development. Taken individually, some of the arguments presented on the Township's behalf would seem plausible, but for the overriding course of conduct of record, which exhibits a persistent intent to thwart our prior Order and in turn the meaningful development of Chesterbrook.

Prior to a disposition of the legal issues before this Court, it is necessary to set forth some basic foundations, and legitimate concerns of the parties litigant in this, and all zoning litigation of this nature.

This Court is not unaware of the controversies plaguing local municipalities which are all too often understaffed and underfunded and which, by no fault

of their own, must deal with certain developers who would prey on the lack of local sophistication to impose shoddy development on the municipality for increased profit to themselves. In large measure, the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10101, was the legislative response to such actions and was an attempt to formalize zoning substantive law and procedure into a modern workable model insuring orderly process in the development of lands in this Commonwealth.

Recently, however, we have noticed an ever increasing undercurrent of sentiment in local municipalities which has as its basis, the rejection of further development per se, regardless of the technical and/or social merit. This no growth status quo thinking surfaces in disputes not unlike the instant one. On one hand, we are presented with a developer, who, in our review of this protracted litigation, has presented plans and approaches of an impeccable nature to the Township for the orderly and constructive use of his tract. On the other hand, we are presented with local officials charged with the responsibility to review, comment upon, give constructive criticism to, and pass upon schemes of planning brought to them by developers, and we are not unsympathetic to the position in which supervisors and other local officials find themselves in discharging their responsibilities. Clearly, their duty is to actively oppose schemes of development unreasonably proposed and conceived, but likewise, their duty is to sanction well planned development.

Our sympathies are taxed, however, when local officials, for trifling, over-technical, or simply reasons unrelated to the law of zoning, oppose development otherwise judicially sanctioned. Most certainly, we must balance the vested rights of the landowner-

developer with the legitimate exercise of police power by local officials in the granting of permits, etc. And, there may well be cases *in futuro* where a township, and its officials, will be able to demonstrate the viability of the objections to the grant of permits and reasons for halting of development of tracts whose zoning in not in question. The record before us does not present such a case.

On December 22, 1976, we entered an Order granting the Fox prayer for enforcement of our previous Order, and the instant opinion is written in support thereof.

The parties to this proceeding have exhaustively set forth the facts and law relative to the present petition for order enforcing judgment, and further, the Township[1] has filed a Motion to Quash the instant petition. Prior to reaching the merits of the petition, we shall dispose of the Motion to Quash.

### Motion to Quash

The Township has filed a Motion to Quash Fox's Petition for Order to Enforce Judgment. As we understand the basis of this motion, the Township is contesting Fox's ability to rely upon Pennsylvania Rule of Appellate Procedure 2951(b) (Pa. R.A.P.) to gain jurisdiction for enforcement of our prior Order. The Township would have us adopt a standard for this as yet judicially uninterpreted rule such that a petition show (1) that petitioner has no adequate remedy at law; (2) that petitioner has a clear legal right; (3) that there exists a corresponding duty in the Township; and (4) that the Township has acted in bad faith.

---

[1] The Township has filed a formal Motion to Quash which CORC supports by way of memorandum, although CORC itself has not filed a formal Motion to Quash.

In essence, the Township likens the instant prayer for relief to a prayer for extraordinary relief in mandamus arguing an adequate remedy at law under the procedural provisions of the MPC, no presently clear right and corresponding duty for relief, and lack of bad faith as factors precluding this Court from exercising its otherwise clear right to enforce the prior Order in this matter.

For the following reasons, we decline to accept such a standard and proclaim our jurisdiction to grant the requested relief.

Section 8(g) of The Commonwealth Court Act, Act of January 6, 1970, P.L. (1969) 434, *as amended*, 17 P.S. §211.8(g), states in relevant part, "The court shall have the power to issue, under its judicial seal, every lawful writ and process necessary or suitable for the exercise of its jurisdiction given by this act *and for the enforcement of any order which it may make. . . ."* (Emphasis added.) Further, Pa. R.A.P. 2951(b) expressly codifies the ability of an appellate court to enforce an order entered by it.

Nor can we accept the notion that Fox's more appropriate remedy is appeal to the zoning board and thereafter to the local court of common pleas, for given the inherent delays in such a process, a party seeking to develop, once having had his zoning validated and reaching the stage of implementation by applications for permits, would surely be frustrated if it became necessary to follow the circuitous route each time a permit application was denied. We are impressed, however, with the adoption of a standard of showing bad faith in a Pa. R.A.P. 2951(b) proceeding such as the instant one, for the question of bad faith in the granting of permits is most certainly central to an inquiry into adherence with an outstanding order of court.

The policy of this Court in exercising its jurisdiction to enforce orders in zoning cases depends on the rights which are deemed inherent in the zoning adjudication itself. Both this Court and the Supreme Court have emphasized that judicial decisions concerning the legality of zoning are not academic exercises, but rather confer upon the landowner the right to develop his land, subject only to the landowner's satisfying applicable legitimate regulations of the township concerning matters of site planning, improvements, etc. The extent of the rights conferred by a zoning adjudication are underscored by cases in which landowners successfully challenged their zoning. Even prior to the statutory provision authorizing courts to approve a successful challenger's plans, this Court and the Supreme Court ordered municipalities to permit development by a successful challenger and to issue necessary permits. *Casey v. Zoning Hearing Board of Warwick Township*, 459 Pa. 219, 328 A.2d 464 (1974), *aff'g* 8 Pa. Commonwealth Ct. 473, 303 A.2d 535 (1973); *Township of Williston v. Chesterdale Farms, Inc.*, 462 Pa. 445, 341 A.2d 466 (1975). The Supreme Court explained this policy in *Casey* in the following manner:

Finally, we must determine whether a court has the power to grant an applicant-challenger definitive relief upon rendering a zoning ordinance constitutionally infirm. The appellee seeks a building permit for the erection of multi-family dwellings on his tract of land located in Warwick Township. This Court, pursuant to its disposition of the petition for enforcement of our order in Girsh Appeal has implicitly held that courts in this Commonwealth do have such power. Obviously, if judicial review of local zoing action is to result in anything more than a farce,

the courts must be prepared to go beyond mere invalidation and grant definitive relief. *Casey v. Zoning Hearing Board of Warwick Township,* 459 Pa. at 230, 326 A.2d at 469. (Footnotes omitted.)

Where a zoning adjudication upholds existing zoning, the landowner's right to proceed should be even more clear, as this right is legislatively as well as judicially conferred, and there can be no question about the applicable zoning and development criteria. The rights conferred by an adjudication upholding zoning were demonstrated by *Linda Development Corp. v. Plymouth Township,* 3 Pa. Commonwealth Ct. 334, 281 A.2d 784 (1971), in which this Court, in upholding a landowner's zoning, at the same time struck down a subsequently enacted ordinance to change the zoning (and thereby prevent development), and also ordered that building permits issue "upon the filing by Linda Development Corporation of all required forms and plans."

The successful litigant's right to proceed by way of Pa. R.A.P. 2951(b) means that unjustifiable actions by a municipality to prevent him from proceeding are in direct conflict with the adjudication establishing the validity of the zoning.

The use which Fox makes of Pa. R.A.P. 2951(b) is precisely that use contemplated by the promulgation of that rule. With this express authority, and the inherent power of an appellate court to enforce its orders, we deny the pending Motion to Quash.

In light of our dismissing the instant Motion to Quash, we will reach and dispose of the merits of the petition to enforce judgment by entry of the following Findings of Fact and Conclusions of Law, together with a discussion of the law applicable thereto, as follows:

18

1. Petitioners include the owners of the tract of land known as Chesterbrook which is located in Tredyffrin Township, Chester County, Pennsylvania, and the President of the company which is the developer for Chesterbrook.

2. On September 30, 1974, the same day that the Court of Common Pleas of Chester County ruled in these cases that the zoning for the Chesterbrook tract was unlawful, the Board of Supervisors of Tredyffrin Township (Board) announced that it would hold a public hearing to consider an ordinance to rezone Chesterbrook to the R-1/2 classification in the Tredyffrin Township Zoning Ordinance. The R-1/2 classification restricts development to detached houses on lots of not less than 100,000 square feet, or 2-1/3 acres.

3. Petitioners responded to the announcement of the proposed rezoning by filing a Motion for Supersedeas with the Commonwealth Court in order to maintain the status quo pending appeal. Tredyffrin Township filed a Memorandum Contra Motion for Supersedeas, and opposed the issuance of a supersedeas order at the hearing on the Motion for Supersedeas before the Honorable HARRY A. KRAMER.

4. Following the issuance of the supersedeas by this Court, the Board took no further action until after these zoning appeals had been adjudicated.

5. As of January 1, 1976, a new Home Rule Charter for Tredyffrin Township became effective, and there was a substantial change in the composition of the Board. Four new supervisors, out of a seven member Board, took office in January, 1976. Messrs. Biddulph, Barnes and Kurtz became supervisors in January, 1976. The fourth new member of the Board, Donald Smith, as well as Mr. Biddulph, were active members of the organization known as CORC. CORC

was formed to actively oppose the development of Chesterbrook, and is one of the parties which brought the present cases in which the zoning of Chesterbrook was challenged. Two of the supervisors who were not newly elected but continued on the Board had voted against every application for development that was submitted under the zoning for Chesterbrook, including the subdivision and related improvement plans which were approved by the Board in 1972 and 1973.

6. With the new composition of the Board in January, 1976, the only supervisor who did not have a publicly stated position of actively opposing the development of Chesterbrook under the zoning upheld by this Court was M. Scott Magargee, Esquire. He was the only supervisor called as a witness by the Board in this proceeding. There was no attempt made by the Board to refute the evidence concerning the publicly stated pledges of six of the seven members of the Board.

7. Within a few days of the date on which the Supreme Court denied allocatur petitions in these appeals, January 8, 1976, the Chairman of the Board announced that the Board would again hold hearings to rezone Chesterbrook to the R-1/2 classification. This announcement was made without any discussion of the matter having taken place at a public meeting of the Board.

8. On or about February 5, 1976, Petitioners filed with this Court a Motion to Hold the Record in the Commonwealth Court. Petitioners explained that their request was made ''in order to facilitate consideration of applications necessary to prevent a nullification of this Court's adjudication.''

9. On February 9, 1976, the Board of Supervisors adopted a resolution to advertise four separate ordinances to rezone the tract to the R-1/2 classification. Each ordinance concerned a separate area of the tract,

and the ordinances taken together would have rezoned the entire tract to the R-1/2 classification.

10. On February 10, 1976, the Board conducted a public hearing on its proposal to rezone Chesterbrook to the R 1/2 classification by a single ordinance applying to the entire tract.

11. On March 10, 1976, this Court granted Petitioners' Motion to Hold the Record in the Commonwealth Court and ordered that "the records in these appeals shall be retained in this Court and shall be remitted by the Chief Clerk on September 8, 1976, absent an Order of the Court to the contrary."

12. On August 9, 1976, the Board of Supervisors announced that it was instructing the Township Solicitor to draw a special ordinance to provide that the density for the Chesterbrook tract could not exceed 1.5 dwellings per acre. The density provided by the approved zoning is between 4 and 4.5 dwelling units per acre. On August 23, 1976, the Board of Supervisors announced a public hearing to consider the proposed ordinance. At the August 23rd meeting the Township Solicitor, without public discussion or any public action by the Board, stated that the ordinance he was drafting would limit development to 2.5 dwelling units per acre.

13. A public hearing on the ordinance to restrict development of the Chesterbrook tract was held on October 11, 1976. At this hearing, the Board announced that it would vote on the proposed ordinance on November 8, 1976.

14. The proposed ordinance, now pending before the Board provides:

(a) That the density of development of the Chesterbrook tract would be restricted to 2.5 dwelling units per acre, in direct contravention of the zoning districts within the Chesterbrook tract;

(b) That 33% of the Chesterbrook tract must be left as open space;

(c) That development plans will not be approved if development would contribute to a level of service of "C" or lower at any intersection or a level of service of "B" or lower on any road (apart from intersections). Level of service "C" is the design criterion of PennDOT for new roads;

(d) That the developer may be required to post a bond prior to development to guarantee that the costs to the Township and School District resulting from development of the Chesterbrook tract would be "offset by tax and other revenues";

(e) That all structures in the Chesterbrook tract must be "compatible with Valley Forge National Park and other historic sites," and that "there be no construction or signs visible from said park";

(f) That final development plans will require approval by the Planning Commission and/or Board of Supervisors. This requirement is in addition to the review procedures presently provided by the Tredyffrin Township Zoning Ordinance, and applies only to the Chesterbrook tract and some ninety (90) acres contiguous to it.

15. Since the issuance by the Supreme Court of its orders denying the petitions for allocatur in these cases, the Board has held a number of nonpublic executive sessions for the purpose of discussing Chesterbrook. The record shows that there have been at least three such meetings in 1976—on January 31, June 14 and June 28. M. Scott Magargee, Esquire, the one supervisor who has testified in these proceedings, stated that he could not recall the matters discussed at any of these meetings, other than "matters involving the litigation surrounding Chesterbrook." The record also shows that at the time of the executive meetings, the litigation concerning the validity of

the zoning was, in fact, terminated and two of these executive sessions occurred shortly after Petitioners submitted their development plans and applications.

16. The Board has proceeded to advertise and consider various proposals to nullify the zoning of the Chesterbrook tract knowing of the extensive effort and expense of Petitioners in acquiring the tract and preparing for development, in reliance on the zoning. Ordinance No. 264 of Tredyffrin Township, to which we referred with approval in our prior opinion in these appeals (*see* 20 Pa. Commonwealth Ct. 426, 431 (1975)), recognizes the commitment and reliance of the Chesterbrook owners, and provides that *"the developer, in turn, shall have a vested right to proceed according to the plans and zoning amendment or amendments."* (Emphasis added.)

*Board of Supervisors' Adoption of Fee Schedules for Review of Plans by Township*

17. On January 5, 1976, the Board adopted a new fee schedule for development plans which must be reviewed through hearings before the Board of Supervisors or Zoning Hearing Board, or which require site plan review by the Planning Commission.

18. On January 26, 1976, the Board adopted a new fee schedule for review of subdivision plans and improvement construction plans. This schedule also sets forth separate fees for agreements (*i.e.*, subdivision agreements, bonds, and deeds of dedication), permits (*i.e.*, storm drain and watercourse permits and permits for street openings, sidewalks and curb cuts), inspections and tests.

19. The Board adopted the new fee schedules at precisely the time that Petitioners were undertaking the preparation of extensive development plans, *i.e.*, after this Court had unanimously upheld the zoning for the Chesterbrook tract and after the time that the Supreme Court denied allocatur petitions.

20. The application submitted by Petitioners on June 2, 1976 to subdivide the entire Chesterbrook tract into a number of large lots was an initial step in the development process for the Chesterbrook tract following the culmination of the zoning litigation. Petitioners needed to subdivide the tract in accordance with its zoning districts in order to prepare final plans for these districts and to obtain approval of development plans.

21. Petitioners were required to pay an application fee of $22,000.00 in order to submit their subdivision plan and application. This fee did not include the separate fees which were charged for the review of the improvement construction plans which were submitted in June and July, 1976. Nor did the subdivision plan include any development within the proposed lots.

22. Mr. Janasik, Assistant Township Manager, spent four or five hours a week for ten or eleven weeks reviewing the plans. Mr. Houtman, an independent engineer employed by the Township to aid in review of various plans, testified that he reviewed in a total time of just fourteen hours other plans which concerned roads, sewers, drainage, etc., which plans were more extensive, technical and detailed than the subdivision plans. Given the hours spent in review, the Township extracted from Petitioners approximately $488.89 for each hour of Mr. Janasik's time. The fee paid by Petitioners was more than Mr. Janasik's entire yearly salary.

23. Under the fee schedule in effect prior to the adoption of the new schedule on January 26, 1976, the fee for review of the same subdivision plans would have been $48.00.

24. Petitioners paid the $22,000.00 subdivision application fee under protest.

24 

25. The $22,000.00 fee which the Board required Petitioners to pay in order to process the subdivision application bore no relation to the expense of the Township in reviewing and otherwise processing the plan.

26. The parties have stipulated and supplemented the record with a list of fees charged by surrounding townships. Excepting those fees listed for Mr. Janasik of the township with respect to fees which this developer would have had to pay for a subdivision application, we find as follows:

| Township | Fee |
|----------|-----|
| Abington | $ 59.00 |
| Cheltenham | $ 113.00 |
| Lower Merion | $13,505.00 |
| West Goshen | $ 145.00 |
| Middletown | $ 58.00 |
| Easttown | $ 3,720.00 |
| Radnor | $ 385.00 |
| Upper Merion | $ 385.00 |
| Haverford | $ 100.00 |

The median fee of these townships for reviewing Petitioners' subdivision application would be $145.00, and the average fee would be $2,052.00.

27. The subdivision application fees which would have been required for reviewing and processing Petitioners' plans by the seven townships bordering on Tredyffrin Township would have been as follows:

| Township | Fee |
|----------|-----|
| Schuylkill | $ 240.00 |
| Charlestown | $1,100.00 |
| Willistown | $ 105.00 |
| East Whiteland | $ 115.00 |
| Easttown | $3,720.00 |
| Radnor | $ 385.00 |
| Upper Merion | $ 385.00 |

The median fee of these townships for reviewing Petitioners' subdivision application would be $385.00, and the average fee would be $864.00.

28. Since the time that the new subdivision fee schedule became effective in January, 1976, Petitioners have paid more than twice as much in subdivision fees as all other subdivision applicants in Tredyffrin Township combined.

29. The increased fees shown on the fee schedules adopted by the Board in January, 1976 cover all kinds of development plans whether or not they involve subdivision. The schedules apply to all planning commission reviews, which are required for commercial and office park development; applications for special exceptions, which are required for all multi-family development; and the filing of condominium declarations. Under these schedules, Petitioners will have to pay at least $338,525.00 to file the applications necessary for their development. This amount of fees does not include fees for improvement construction plans (showing roads, sewers, drainage, etc.), fees for subdivision agreements and escrow agreements, fees for recording deeds of dedication, fees for permits for storm drainage and water courses, fees for all inspections and tests, fees for costs of transcript of hearings, or fees for building permits. Moreover, these fees are in addition to the $22,000.00 subdivision fee already paid.

30. Under the fee schedules of Tredyffrin Township in existence prior to the new schedules adopted in January, 1976, the Township fees for the review and processing of the Chesterbrook development plans would have been approximately $9,640.00.

31. Prior to the enactment of the present zoning for the Chesterbrook tract in March, 1972, the developer had submitted plans for the development of the tract which he was committed to follow (20 Pa. Com-

26

monwealth Ct. at 431). These plans set forth the number of single family detached houses, the number of townhouses, the number of apartments, the acreage of commercial use, the number of square feet of office park, etc. It was also clear from these plans what review procedures would be applicable in order for the developer to obtain approval of final plans for each type of development.

32. The major impact of the new schedules is on multi-family residential development. The Chesterbrook tract contains the only land in Tredyffrin Township which is zoned for multi-family residential use which is not already developed, except for the possibility of only seven acres elsewhere in the Township. Chesterbrook has 284 acres zoned for multi-family residential use.

33. The increase in subdivision application fees and in other application fees for reviewing and processing development plans has the effect of discouraging development of the Chesterbrook tract under its present zoning, and extracts substantial revenue from Petitioners, unrelated to the Township's costs in processing applications, in the event that Petitioners attempted to develop their property.

*Board of Supervisors' Repudiation of Approvals Given and Permits Issued for Chesterbrook in 1972 and 1973*

34. On August 14, 1972, the Board of Supervisors of Tredyffrin Township approved subdivision and related improvement plans for 40 lots constituting Section I of the R-1 District in the northeast portion of the Chesterbrook tract. The plans bear the stamp of approval by the Board and consist of three sheets. These plans, in addition to showing the forty lots, show storm water control systems, the sanitary sewer systems, cross-sections and specifications for the pav-

ing of the roads, the width of cartways and road rights-of-way, concrete sidewalks, and other data. The plans are dated May 3, 1972.

35. At the time the Board acted to approve Section I plans on August 14, 1972, it also had a set of more detailed subdivision and improvement construction plans submitted by the developer, which included complete engineering for improvements. These plans were dated July 5, 1972 and consist of six sheets. The developer was required by the Township to submit these further detailed plans prior to obtaining subdivision approval.

36. On September 25, 1972, Tredyffrin Township entered into an escrow agreement with the developer and Industrial Valley Bank to guarantee the completion of improvements associated with twelve lots in Section I. The improvements so guaranteed by the developer and required by the township are the improvements shown on the plans referenced in findings 34 and 35. These improvements include Franklin Road and certain improvements on Valley Forge Road. The amount of the escrow was $66,000.00. This escrow agreement has been operative at all times since September 25, 1972.

37. The practice of Tredyffrin Township has been to enter into escrow agreements to guarantee improvements after the plans showing those improvements have been approved.

38. Following the submission and approval of improvement construction plans for Section I, the developer submitted a grading plan for lot 11 in Section I. Thereafter, the Township and developer entered into the aforesaid escrow agreement, and Tredyffrin Township issued a building permit to the developer for lot 11 in Section I on September 28, 1972.

39. In the late Spring of 1973 the developer submitted to Tredyffrin Township a grading plan for lots 1 through 12 of Section I. The plan is dated May 31,

1973, and is in evidence as P-11. These were the same lots covered by the escrow agreement.

40. On June 15, 1973, Tredyffrin Township issued eleven additional building permits to the developer, for lots 1 through 10 and 12 of Section I.

41. Under the Zoning Ordinance of Tredyffrin Township, building permits for houses in a subdivision are not issued until after the subdivision and improvement plans associated with those lots have been approved and guaranteed. Moreover, it is the practice of the Township not to issue such building permits until after the plans for improvements associated with the lots have been approved.

42. Subdivision plans for Section II of the R-1 District in the northeast portion of the Chesterbrook tract were approved on September 10, 1973. Section II contains eighty lots (in addition to the forty contained in Section I). Prior to this approval, the developer was required to submit for Township review the same kind of detailed improvement plans for Section II as he had submitted for Section I. In the two and one-half years that the Township had these improvement plans prior to the events described below, there was no indication given to the developer that there was any objection to these plans.

43. On November 13, 1973, the Pennsylvania Department of Environmental Resources issued an erosion and sediment control permit to the developer authorizing the developer to undertake the earthmoving activities necessary to install the improvements for Sections I and II which were shown on the plans submitted to and approved by Tredyffrin Township.

44. Following the Order by the Supreme Court on January 8, 1976, denying allocatur in these zoning appeals, Petitioners proceeded with work on the Chesterbrook tract in preparation for installing the improve-

ments shown on the improvement plans described in findings 34 and 35.

45. After Petitioners had undertaken work on the site pursuant to their erosion and sediment control permit and the improvement plans approved by Tredyffrin Township, the Township informed the developer that it considered that improvement construction plans had never been approved. The Township took this position in spite of the clear record of its approvals, its execution of the Escrow Agreement based on the approvals, its issuance of building permits based on the approvals, and the absence of any objection to the plans since 1972 and 1973, when they were submitted. Due to the Township's position, Petitioners had to terminate their work on the site.

46. Following the denials of allocatur by the Supreme Court in the zoning appeals, the Township also took the position that the twelve building permits were not valid.

47. Petitioners resubmitted improvement construction plans for Sections I and II in June, 1976, without prejudice to their position that improvement construction plans for Section I and II had already been approved. Both sets of plans were rejected on the basis of the paving specifications, which were the same as the paving specifications earlier approved except that they contained an increase of one inch in the amount of I. D. blacktop (from two to three inches). The only other reason given for rejection was that two roads in Section I showed a paving width of twenty-four feet rather than twenty-seven feet. The twenty-four foot width for these roads is clearly shown on the subdivision plans approved in 1972. One of these roads, Franklin Road, was the subject of the Escrow Agreement, to which the Township is a party, pursuant to which Franklin Road is guaranteed for completion with a width of twenty-four feet.

## Board of Supervisors' Rejection of All Developmental Plans

48. In the Spring of 1976 Petitioners undertook the substantial additional planning necessary for the first phase of development. This planning, along with the refusal by the Board to recognize prior approval of plans for the R-1 District, resulted in the submission of five separate sets of plans to the Township in June and July, 1976. These consisted of the subdivision plans for the entire Chesterbrook tract; the improvement construction plans for Chesterbrook Boulevard, Duportail and Lee Roads, respectively; and the improvement plans for Sections I and II, respectively, of the R-1 District.

49. On June 2, 1976, Petitioners submitted an application to subdivide the entire Chesterbrook tract, so that it would consist of nineteen lots conforming with zoning districts in the tract. This is the application for which Petitioners were required to pay $22,000.00.

50. On June 8, 1976, Mr. Janasik, in his capacity as Assistant Township Manager, sent a letter to the developer. He stated:

> I am not quite sure of the purpose of sheets number 2-aa and 2-bb. The sheets resemble the type of plan usually submitted with individual subdivision applications, and, therefore, appear to represent a sub-subdivision, if you will, of proposed Parcel #18. If that is the case, a separate subdivision application should be filed to include a separate completed application form and a check to cover the filing fee. If the two sheets were included for reasons other than preliminary or final subdivision review, please so indicate.

51. On June 10, the developer sent a letter to Mr. Janasik in which he responded to Mr. Janasik's inquiry as follows:

With respect to sheets 2-aa and 2-bb, the lots and roads shown in parcel 18 are intended to meet the requirement of section 623.1 of the Subdivision Ordinance by showing easements that exist by virtue of previous subdivision approvals. We are not requesting subdivision approvals for lot 18, which already has subdivision approval.

52. On July 1, 1976, the Planning Commission considered the subdivision application at a public meeting. At that meeting the Planning Commission gave no indication of any objection or problem concerning the subdivision plans.

53. Apart from the Janasik letter of June 8, 1976, and the Planning Commission meeting of July 1, 1976, the developer received no communication from the Planning Commission or anyone associated with the Township concerning the review of the plans. The subdivision plans were not again the subject of discussion or action at any public session of the Planning Commission until August 19, 1976, which was seventy-eight days after the plans were submitted, and just two working days before the last scheduled meeting of the Board of Supervisors within the ninety-day period in which the Township was required to act.

54. The procedure followed by the Township, its staff, and the Planning Commission was not in accord with the Subdivision Ordinance and normal practice in the Township. Section 421 of the Township Subdivision Ordinance provides:

The Preliminary Plan will be reviewed by the Tredyffrin Township Planning Commission and the Chester County Planning Commission normally within 30 days of submission. The rec-

ommendations of both bodies will be forwarded to the Board of Supervisors for their approval or disapproval.

The Subdivision Ordinance, Part II, entitled "Subdivision Procedure," states:

> Therefore, under ordinary circumstances, Township approval may be excepted [sic] in a minimum of fifty days, unless unresolved questions or conditions require the application to be held over for further consideration.

There was no indication of any unresolved question or condition prior to the Planning Commission meeting of August 19, seventy-eight days after the application was made. Nor, was any question as to the merits of the plans ever raised within the Township staff or Planning Commission until substantially after the fifty-day period.

55. The normal practice of Tredyffrin Township is to communicate any potential problems or objections to a subdivision applicant, so that such matters can be discussed and resolved prior to action by the Board of Supervisors. This practice was not followed with respect to the subdivision and other plans submitted by Petitioners in June and July, 1976.

56. At its public meeting on August 19, 1976, the Planning Commission voted against recommending approval of the subdivision application. The Planning Commission's decision was based on what it termed "technical errors" in the plan. The "technical errors" were two in number. The first technical error was that three of the nineteen lots should be further subdivided because these three lots were bisected by existing or proposed roads. The second alleged "technical error" was that the plans should not have included two pages showing the already existing lots in the R-1 District.

57. Prior to its August 19, 1976 meeting, the Planning Commission had never given Petitioners any indications that it believed that the plans contained any "technical error." On the day following the Planning Commission meeting, an officer of the Fox Companies, went to the Township Building to obtain an explanation of the "technical errors" to which the Planning Commission had alluded at its meeting. Mr. Janasik advised the officer that the alleged "technical error" of showing previously approved lots could be cured by simply removing the two pages of the plans which showed these lots. The remedy for the "technical error" concerning alleged additional lots created by proposed roads was simply to create additional lot lines along these proposed roads.

58. The developer made the modifications to meet these alleged errors within the two working days between the Planning Commission meeting and the meeting of the Board to vote on the subdivision application. The Board, however, refused to consider the modifications, and rejected the subdivision application on the basis of the two "technical errors" alleged by the Planning Commission.

59. The Planning Commission and the Board acted in such a manner as to reject Petitioners' subdivision application by waiting until the last possible moment to raise objections, and then claiming that there was insufficient time to consider Petitioners' response. It was the Board's position that the modification of the plans would not be considered without a new application, which would post date the advertisement of the newest rezoning ordinance for Chesterbrook and entail a new ninety day waiting period.

60. The Board's rejection of the subdivision application on the ground that a proposed road bisecting a lot automatically creates an additional lot was not bottomed on any legal precedent and is contrary

to the Subdivision Ordinance of Tredyffrin Township. The Subdivision Ordinance, Section 208, defines the term "lot" as, "A parcel of land intended for transfer of ownership or building development." The additional lots which the Board would require would involve land which will be part of a larger, undeveloped open space system or land which will be part of a larger and integrally planned area which will be used for a golf course. The division of the larger lots would have no relevance to development or transfer of ownership. The creation of the additional lots would confuse development by creating additional, meaningless legal and tax entities.

61. The Board, in its official letter advising the developer of the reasons for its rejection of the subdivision application, cites Sections 624.2 and 624.3 of the Subdivision Ordinance as the only legal basis for objection concerning alleged additional lots. Mr. Janasik admitted that these sections of the Subdivision Ordinance do not support the theory of additional lots, and that there is no support for this theory in the Subdivision Ordinance or Zoning Ordinance of Tredyffrin Township. The Township Solicitor has not been able to cite any authority for this theory at the hearings on the pending Petition for Order to Enforce Judgment. Mr. Janasik stated that he was aware of the several instances of roads or proposed roads bisecting lots in the subdivision plans "from the beginning," but that it didn't occur to him that this was objectionable until several days before the meeting of the Planning Commission on August 19.

62. The Board's other ground for rejection was that the subdivision plans should not have included previously approved lots in the R-1 District. The lots shown within the R-1 District were approved previously. By letter dated June 10, 1976, Petitioners informed the Township that no approval for these al-

ready approved lots was requested, and that they had shown the lots solely to satisfy Section 623.1 of the Subivision Ordinance. The Board refused to consider the developer's prompt removal of these sheets following the Planning Commission's first reference to this "technical error."

63. Prior to, or during the preparation of the improvement construction plans for Chesterbrook Boulevard, Duportail Road and Lee Road, the developer met with the appropriate members of the Township staff to discuss Township requirements, including the interpretation of certain Subdivision Ordinance requirements. A number of such meetings occurred during the Spring and early Summer of 1976, involving Mr. Fox and his assistant, Mr. Hovey, for the developer and Mr. Janasik and Mr. Kelley (Superintendent of Public Works) for the Township. This is standard practice of developers and townships in situations where a developer is undertaking the preparation of major development plans. Mr. Erfle of Yerkes Associates, Inc., the developer's engineers, had discussions with Mr. Kelley in September, 1975, concerning paving specifications for Chesterbrook roads. The meetings between the developer and Township staff continued even after the developer submitted his plans, and led to certain modifications being made by the developer.

64. Tredyffrin Township retained an engineer, John E. Houtman, to review the four sets of improvement construction plans submitted by Petitioners. No one informed Mr. Houtman of the extensive discussions between the Tredyffrin Township staff and the developer, and of the understandings and agreements reached during these discussions.

65. Mr. Houtman was instructed to compare the engineering aspects of the four sets of improvement construction plans against the requirements of the Tredyffrin Township Zoning Ordinance. The Subdi-

vision Ordinance specifies the use of HE material in the "black top" portion of intercommunity and residential roads. HE material is considered undesirable for construction of new roads and is not generally available. HE material has not been used in the construction of new roads in the Philadelphia area in at least several years. Construction of intercommunity and residential roads, without HE material and with widely varying specifications, has been regularly approved by Tredyffrin Township for a number of years in violation of the specifications in the Subdivision Ordinance.

66. Prior to undertaking engineering for the major roads within the Chesterbrook tract, Paul Erfle of Yerkes Associates (the developer's engineers) spoke with Frank Kelley, the Superintendent with Public Works for Tredyffrin Township, to reach agreement on a paving specification for intercommunity roads. Mr. Erfle and Mr. Kelley reached agreement on a specification for intercommunity roads, which Mr. Erfle confirmed in writing. Mr. Erfle requested a response from Mr. Kelley if he had not correctly understood the agreed upon specification. Mr. Erfle received no response.

67. Mr. Kelley was the appropriate Township official with whom to discuss matters concerning road construction.

68. The paving specifications agreed upon by Messrs. Kelley and Erfle are as follows:

 1″ ID-2 Surface
 2″ ID-2 Binder
 6″ Crushed Stone Base (screened)
 1″ Limestone Screenings
 Prepared subgrade

Based upon this agreement, Mr. Erfle proceeded to use the foregoing paving specifications in the four sets of improvement construction plans.

69. The nature of the paving specifications used by developers and contractors with the Township's approval, in lieu of the specifications in the Subdivision Ordinance, is illustrated by the subdivision and improvement construction plans which were approved by the Board for Section I of the R-1 District in 1972. Those approved plans show the following paving specifications:

2″ Bituminous surface course

6″ Crushed stone base course

1″ Limestone screenings

The roads shown on these plans for Section I are classified as "residential" roads under the Subdivision Ordinance. Residential roads have the same paving requirements under the Ordinance as "intercommunity service" roads. As previously noted, the paving specification agreed upon by Mr. Kelley and Mr. Erfle required an extra inch of ID material in comparison with the above specification approved in 1972. Similar examples of substituted paving specifications for township "residential" roads, showing 2 or 2½ inches of ID material, are set forth in exhibits of record.

70. After the improvement construction plans for Chesterbrook Boulevard were submitted on June 2, 1976, they were the subject of several meetings between the developer and Mr. Janasik and Mr. Kelley. The paving specifications agreed upon by Mr. Kelley and Mr. Erfle are shown on these plans. Neither Mr. Kelley nor Mr. Janasik, nor any other representative of the Township, questioned this specification.

71. On two occasions prior to the October 19, 1976 hearing in this matter Tredyffrin Township has stated that the letter written by Mr. Erfle and Mr. Kelley was received by the Township. At the public meeting of the Board of Supervisors on August 23rd, the Township Solicitor, in commenting on the letter, stated: "By the way, just so that the record is clear,

I asked Mr. Mawby to get that letter for me so that I could be certain in my own mind as to what transpired.''

72. Mr. Houtman, following his instructions from the Township staff, compared the paving specifications in the plans against those of the Subdivision Ordinance. Mr. Houtman compared the plans against the diagrams as shown on Exhibits PD-2 and PD-3. These diagrams specify and required the use of HE material. Petitioners' improvement construction plans did not conform to the Subdivision Ordinance, and Mr. Houtman so noted. No other person's plans conformed to this requirement. The developer had an agreement with the appropriate Township staff to use the paving specifications shown on the plans.

73. In his report to the Township, Mr. Houtman noted the discrepancy in paving specifications, and stated: ''This issue of the required and acceptable street paving standards should be clarified.'' Neither the Board nor the Township staff made any attempt to clarify the misunderstanding.

74. The paving specification used by the developer is based upon the use of ID-2 material rather than HE material. ID and HE are not comparable. Clarence Stone, a registered engineer and expert in road construction, testified that "HE would be more or less like a sponge, more open in structure, and ID would be a dense structure. It's like a board." Mr. Stone stated that "The ID-2 by far is a superior mix." Mr. Stone also testified that the specification used by the developer "is a much better surface" than the specification in the Subdivision Ordinance.

75. The superiority of the material used (ID-2) to that in the paving specification of the Subdivision Ordinance was confirmed by Mr. Houtman.

76. Mr. Houtman noted two other possible discrepancies between Petitioners' improvement construc-

tion plans and the Township Subdivision Ordinance which were used by the Board as a basis for rejection. Unlike the paving discrepancy, which applied to all four sets of improvement construction plans, each of these additional comments concerned only one of the four sets of plans. The additional discrepancies concerned the definition of Chesterbrook Boulevard, *i.e.*, whether it is an intercommunity service street or primary thoroughfare under the Subdivision Ordinance, and the cartway width of two roads in Section I of the R-1 District.

77. The definition of Chesterbrook Boulevard is relevant because right-of-way and cartway widths are based upon the definition of a road under the Subdivision Ordinance.

78. The matter of applicable road definition for Chesterbrook Boulevard was discussed by the Township staff and the developer prior to and during the preparation of the improvement construction plans for Chesterbrook Boulevard. Mr. Janasik, the person responsible for land planning matters for the Township, participated in these discussions. Following these discussions, Mr. Janasik and the developer agreed that Chesterbrook Boulevard is an intercommunity service street under the Tredyffrin Township Subdivision Ordinance. The developer proceeded with the plans for Chesterbrook Boulevard on the basis of this understanding. At no time did any representative of the Township ever indicate to the developer anything contrary to the position of the responsible staff that Chesterbrook Boulevard is an intercommunity service street.

79. Even after the improvement construction plans for Chesterbrook Boulevard were submitted, and meetings were taking place between the developer and Township staff to review the plans, there was no suggestion of any problem in the definition that

was followed for Chesterbrook Boulevard. The only matter raised affecting cartway width in any way was curbing. As a result of discussions concerning curbing, the plans were modified to conform to the recommendations made by the Township staff.

80. Mr. Houtman assumed in his report to the Township that Chesterbrook Boulevard should be a primary thoroughfare. Mr. Houtman stated that the answer to this question involved land planning—not engineering—and that it should be resolved by land planners as opposed to an engineer. From the engineering prospective, Mr. Houtman testified that he was satisfied with the improvement construction plans for Chesterbrook Boulevard.

81. Mr. Houtman was retained by Tredyffrin Township to obtain an opinion with respect to matters concerning engineering, and only engineering.

82. No member of the staff or the Board of Supervisors made any effort to discuss with Mr. Houtman any of the comments or questions raised in his report.

83. The conclusion that Chesterbrook Boulevard is an intercommunity service street was jointly arrived at by the developer and the Tredyffrin Township official responsible for land planning matters. These people had information concerning the use and function of the proposed road, including traffic studies, and the knowledge and experience to evaluate the road in terms of the definitions of the Subdivision Ordinance. No information was given to the Board concerning the function or use of Chesterbrook Boulevard which was inconsistent with their conclusion.

84. The other discrepancy mentioned in Mr. Houtman's letter which was cited by the Board in one of its rejections concerned the cartway width of two roads in Section I of the R-1 District. Mr. Houtman indicated in his report that, with respect to Franklin Lane and Solomon Lane, "the question arises as to

whether the cartway should be 27 feet instead of 24 feet as shown.''

85. Franklin Lane and Solomon Lane were both included on the subdivision and improvement construction plans for Section I which were approved by the Board in August, 1972. These previously approved plans show a cartway width of twenty-four feet for the roads later designated as Franklin Lane and Solomon Lanes. Under the Subdivision Ordinance of Tredyffrin Township, subdivision approval constitutes official approval of ''the arrangement and dimensions of streets.'' Franklin Lane, as shown with twenty-four feet cartway width, was the subject of the Escrow Agreement entered into by Tredyffrin Township in September, 1972. Between the time that the plans for these roads were approved in 1972 and the receipt of Mr. Houtman's letter, there was no indication of any problem concerning the cartway width of these roads. In January and February, 1976, the Township had approved additional bonding amounts for these roads, which required review of the plans, without questioning the cartway widths or paving specifications.

86. When the developer learned that Mr. Houtman would be submitting a report concerning Chesterbrook plans, he asked to be provided a copy as soon as the report was received. Tredyffrin Township received the report from Mr. Houtman on August 5, 1976. Mr. Fox received his copy on Friday, August 13, 1976.

87. On August 17, 1976, Mr. Fox called Mr. Janasik on the telephone because of his concern for Mr. Houtman's letter. In that conversation, Mr. Janasik repeated that he agreed that Chesterbrook Boulevard should be considered an intercommunity service street. Mr. Janasik also suggested that Mr. Fox write a letter to the Board outlining the history of the mat-

ters referenced by Mr. Houtman and clarifying Mr. Fox's position.

88. On August 20, 1976, a letter from Mr. Fox to the Board, in response to Mr. Houtman's letter, was hand delivered to the Township. In his letter, Mr. Fox answered Mr. Houtman's comments by providing most of the information which Mr. Houtman had never been permitted to consider. Mr. Fox attached to his letter a copy of Mr. Erfle's letter to Mr. Kelley.

89. On August 23, 1976, the Board rejected the two sets of improvement construction plans with respect to which the ninety day period for decision would expire before the next scheduled meeting of the Board. The plans rejected at the August 23rd meeting were the plans for Chesterbrook Boulevard and the resubmitted improvement construction plans for Section I of the R-1 District.

90. The Board rejected the plans for Chesterbrook Boulevard on the grounds of failure to follow the paving specifications in the Subdivision Ordinance and noncompliance with cartway and right-of-way requirements for primary thoroughfares. The Board rejected the plans for Section I of the R-1 District on the same ground concerning paving specifications, and on the ground that cartway widths for Franklin Lane and Solomon Lane showed 27 feet instead of 24 feet.

91. At the public meeting of the Board on August 23, 1976, counsel for the developer called the Board's attention to the letter of Mr. Fox, dated and delivered on August 20th, and to the letter from Mr. Erfle to Mr. Kelley, dated September 30, 1975. Counsel was informed by the Chairman of the Board that he was out of order and could not comment until after all of the votes on the Chesterbrook plans had been taken. Subsequently, after the votes were taken (and all of the plans rejected), the Township Solicitor commented that he had asked Mr. Mawby to get Mr. Erfle's let-

ter and had reviewed the letter, and that he interpreted the letter as "an effort in my judgment to force the Township into some kind of requirement."

92. Following the Board's public meeting on August 23, 1976, the developer again wrote a letter to the Board, dated September 3, protesting the Board of Supervisors' use of Mr. Houtman's comments to reject the plans for Chesterbrook Boulevard. The developer reiterated that he had proceeded pursuant to the understanding of his engineers with Mr. Kelley, and noted that the paving specifications used in the four sets of improvement construction plans "represent an upgrading of the previous specifications." The developer even suggested that if the Board's reference to paving specifications represented a real concern, the Board could approve the plans conditioned on the use of different paving specifications. The developer closed his letter by urging the Board "to desist from its intentional bad-faith use of Mr. Houtman's comments" in considering whether to approve the still pending plans for Duportail and Lee Roads and for Section II of the R-1 District.

93. On September 13, 1976, the Board rejected the improvement construction plans for Section II of the R-1 District. These plans show the basic improvements (such as roads and sewer lines) associated with the eighty lots in Section II of the R-1 District. The sole ground given for the rejection of the plans was the noncompliance of the paving specifications on the plans with the paving specifications in the Subdivision Ordinance. In the official letter of rejection, the Board stated the basis of its rejection as follows:

Specifically, the proposed specifications for roads within Section II are at variance with the minimum design and material specifications for Residential Streets as described in Appendix 'C,' Plate 6 of the Subdivision Ordinance. Sec-

tions 591, 592 and Subsection 592.2 require strict adherence to these minimum design specifications.

94. The September 13th meeting of the Board was the last scheduled meeting of the Board within the ninety day period within which it was required to act following submission of the improvement construction plans for Section II.

95. At its meeting on September 13, the Board also rejected Petitioners' improvement construction plans for Duportail and Lee Roads. Duportail Road is a major internal road of the proposed development. The Board has evidenced considerable confusion as to whether it rejected these plans at its September 13th meeting, as demonstrated by the denial in its Answer to Supplement to Petition for Order to Enforce Judgment, Paragraph 2, and by the fact that this matter was listed on the Board's agenda for its next meeting. The Board, however, presently considers that it has rejected these plans and has not issued any permit.

96. No member of the Board of Supervisors and no member of the staff of Tredyffrin Township made any effort to inquire into the matters raised by Mr. Houtman in his letter of August 5, 1976, at least until *after* all of the Petitioners' plans had been rejected and the present legal proceeding was instituted. The absence of investigation included the failure to make any inquiry of Mr. Houtman; the failure to make any inquiry of Mr. Kelley concerning his discussion and agreements with the developer's engineer or concerning the practice of the Township in approving various paving specifications without HE material; and the failure by the Board to make any inquiry of Mr. Janasik concerning his judgment and understanding with the developer that Chesterbrook Boulevard is an intercommunity service street, even though the Board

admits that it relies on the staff for such determinations.

97. The Board disregarded the developer's letters to it dated August 20 and September 3, 1976. These letters attempted to answer the comments of Mr. Houtman. The Board did not consider or make any inquiry concerning the information provided in these letters. The Board never responded to these letters.

98. The Board has rejected all of the development plans and permit applications submitted by Petitioners since Petitioners' right to proceed in accordance with the zoning for the Chesterbrook tract was determined in these zoning appeals.

99. Prior to the rejection of Petitioners' four sets of improvement construction plans in August and September, 1976, the Board had not rejected improvement construction plans of any applicant since at least the beginning of 1971. In this period, from the beginning of 1971 to the time of the rejection of Petitioners' plans, eleven applications for improvement construction approval were approved, and none were rejected.

100. Since the final adjudication with respect to zoning in these cases, Petitioners have been incurring a cost of more than $3,000.00 per day to simply hold the Chesterbrook tract, without any development.

101. The amount of $3,000.00 consists of interest, insurance and other costs attendant to ownership of land ready for development.

102. Petitioners have been ready to undertake the development of the Chesterbrook tract, pursuant to the zoning upheld by this Court, since the adjudication concerning the zoning became final on January 8, 1976.

103. Petitioners are being prevented from proceeding with development solely because of the refusal of the Board to approve any of their plans and to issue any permits.

### Conclusions of Law

1. This Court has jurisdiction to adjudicate the pending Petition for Order to Enforce Judgment now before us.

2. An appellate court in this Commonwealth has inherent powers to issue an appropriate order after it has rendered an appellate adjudication where a party in the case is following a deliberate and planned course of action to deprive the prevailing party of his rights under the adjudication. *See Casey v. Zoning Hearing Board of Warwick Township,* 459 Pa. 219, 328 A.2d 464 (1974).

3. An appellate court in this Commonwealth has the inherent power to issue an appropriate order in aid of its judgment where one of the parties in the case is intentionally causing irreparable damage to another party by refusing to abide by the appellate decision. *Ellick v. Board of Supervisors of Worcester Township,* 17 Pa. Commonwealth Ct. 404, 333 A.2d 239 (1975).

4. Section 8(g) of The Commonwealth Court Act, 17 P.S. §211.8(g), and Pa. R.A.P. 2951(b) give this Court express authority to issue any order which is necessary or appropriate in the exercise of its jurisdiction or enforcement of its judgment.

5. In addition to the bases of jurisdiction set forth, this Court also has jurisdiction over the parties and subject matter by virtue of having retained the record in these cases following its decision. These cases, therefore, are still before this Court.

6. The fees charged by a municipality for services it renders in performing its official functions must be based on the costs of the municipality in performing that service. *Warner Bros. Theatres, Inc. v. Pottstown Borough,* 164 Pa. Superior Ct. 91, 63 A.2d 101 (1949); *Pottsville Borough v. Pottsville Gas Company,*

39 Pa. Superior Ct. 1 (1909).; *University Park Cinemas, Inc. v. Borough of Windber,* 59 D. & C. 2d 726 (1972). A municipality cannot use its power to charge fees for issuing licenses or permits for the purpose of raising revenue for general governmental purposes.

7. The fee schedules adopted by the Board of Supervisors concerning review and processing of land development plans establish fees bearing no relation to the costs of the Township in reviewing and otherwise processing the plans. The schedules, therefore, are unlawful and may not be enforced.

8. Petitioners are entitled to a refund of all sums which they were required to pay under the unlawful fee schedules adopted by the Board in January, 1976, save only the amount which they would have been required to pay under the fee schedules which were previously operative.

9. Petitioners are entitled to proceed with development in accordance with the zoning upheld by this Court. Petitioners cannot be denied this right by a change in zoning. *Yocum v. Power,* 398 Pa. 223, 157 A.2d 368 (1960); *Commercial Properties, Inc. v. Peternel,* 418 Pa. 304, 211 A.2d 514 (1965); *Linda Development Corporation v. Plymouth Township,* 3 Pa. Commonwealth Ct. 334, 281 A.2d 784 (1971); *Limekiln Golf Course, Inc. v. Zoning Board of Adjustment of Horsham Township,* 1 Pa. Commonwealth Ct. 499, 275 A.2d 896 (1971); and see *Cheltenham Township Appeal,* 413 Pa. 379, 196 A.2d 363 (1964). Moreover, any rezoning of the Chesterbrook tract would violate Section 2003(4) of the Tredyffrin Township Zoning Ordinance, which expressly recognizes Petitioners' vested right to proceed in accordance with their zoning.

10. When a "plat," as defined by the Municipalities Planning Code, has been approved, the land development improvements shown thereon are approved, and the applicant is entitled to proceed in accordance

with the approved plans. Sections 107(16) and 508 of the MPC, 53 P.S. §§10107(16) and 10508.

11. A township which has approved plans showing improvements for a subdivision, entered into an escrow agreement guaranteeing completion of the improvements, and issued building permits for the subdivision cannot contend, in good faith, that the improvements were never approved.

12. Approval of Petitioners' subdivision plans for Section I of the R-1 District constituted approval of the dimensions of rights-of-way and cartways of streets shown on the plans.

13. A township cannot lawfully reject subdivision plans unless the plans actually violate a provision of a statute or ordinance. *Horst v. Derry Township Board of Supervisors*, 21 Pa. Commonwealth Ct. 556, 347 A.2d 507 (1975); *Brauns v. Swartzmore Borough*, 4 Pa. Commonwealth Ct. 627, 288 A.2d 830 (1972).

14. There is no provision by statute or in the Tredyffrin Township Subdivision Ordinance that a proposed road cannot exist within a lot.

15. A municipality may not reject a development plan on the basis of an obsolete specification which it is not applying to other like plans, and which it has not applied to plans for a number of years. Nor can the municipality reject the specification substituted by the applicant where this specification is superior to the obsolete, unused specification of the ordinance.

16. A municipality has a legal obligation to proceed in good faith in reviewing and processing development plans. The duty of good faith includes discussing matters involving technical requirements or ordinance interpretation with an applicant, and providing an applicant a reasonable opportunity to respond to objections or to modify plans where there has been a misunderstanding or difference of opinion.

17. Petitioners are entitled to have their subdivision plans for the Chesterbrook tract approved by Tredyffrin Township.

18. Petitioners are entitled to have their improvement construction plans for Chesterbrook Boulevard approved, and to have Tredyffrin Township issue a permit authorizing Petitioners to proceed with construction of Chesterbrook Boulevard.

19. Petitioners are entitled to have their improvement construction plans for Section I of the R-1 District approved, or to have Tredyffrin Township recognize its approval of such plans in 1972, and to have Tredyffrin Township issue a permit authorizing construction of the improvements for Section I.

20. Petitioners are entitled to have their improvement construction plans for Duportail and Lee Roads approved, and to have Tredyffrin Township issue a permit authorizing the construction of these roads.

21. Petitioners are entitled to have their improvement construction plans for Section II of the R-1 District approved, and to have Tredyffrin Township issue a permit authorizing construction of the improvements for Section II.

22. In view of action by the Board of Supervisors to deprive Petitioners of their rights under the adjudication of this Court, it is appropriate for this Court to order the Board to cease and desist from its plan and actions to prevent Petitioners from developing their land pursuant to its zoning.

23. This Court will retain the record in these cases, and Petitioners may re-petition this Court for relief in the event that the Board of Supervisors persists in conduct obstructing normal development.

### Merits of the Petition

Upon review of Fox's Petition for Order to Enforce Judgment, its Supplement, answers filed in re-

sponse thereto, allegations contained therein, and proofs presented upon hearing, we decide as follows:

1. *Advertising of Proposed Ordinances Amending Zoning Validated by this Court.*

Following denial of allocatur, the Township began consideration and advertising of various ordinances affecting the Chesterbrook tract having the effect of changing density requirements, requiring stricter air quality and traffic standards to be implemented, as well as the proposed placing of portions of this tract into a historic district subject to special regulation given the recent nationalization of the adjacent Valley Forge Park area.

In defense of these actions, the Township argues that our prior Order validating the Chesterbrook zoning does not for all time prevent minor zoning changes to the tract; however, this argument overlooks the owner-developer's vested right in judicially approved zoning. Attempts to legislatively amend approved zoning for the purpose of frustrating development can be viewed as nothing more than contempt of our Order.

Moreover, the practical implications of advertising or allowing such proposals to become public knowledge gives rise to an aura of uncertainty with respect to the feasibility of development of the tract in question. Bankers and other financial institutions will be less likely to extend credit under such circumstances. Potenial buyers will become wary and a general atmosphere of unpredictability as to the abilities of the developer to complete his development will be projected. Actions such as advertising and contemplating zoning changes, together with other dilatory tacts to be mentioned later in this opinion, have a further consequence. The staggering cost to the developer in lost interest on his outstanding financing may be fatal to a development. Indeed, armed with this knowledge,

many municipalities purposefully delay in an attempt to financially destroy a developer entering the territorial limits. In this case, Petitioner is expending some $3,219.00 per day in interest upon his financing. The irreparable nature of harm to him is most evident. We perceive the advertising of zoning changes not to be harmless as argued, but in fact to be one of the most aggrievous and detrimental acts effectively frustrating development.

2. *Amendment of Fee Schedules.*

Without detailing the exact increases legislated by the Township (*See* Findings of Fact Nos. 17-33), suffice it to say that the Township's argument that the fee schedules had not been amended in many years and thus were not reflective of current schedules implemented in this local, would be more credible if these amendments were not made at the precise time of development of Chesterbrook and were not amended to most directly affect that development.

In support of their contention that the new subdivision fee schedule was not aimed at Petitioners, the Board of Supervisors assert that they did not know that Petitioners would be submitting a subdivision application for their tract, and suggest that such an application is not required. The record belies such a conclusion, however, for Mr. Fox testified that the Assistant Township Manager suggested the necessity for subdividing the tract prior to the submission of the plans, and the Zoning Ordinance provisions applicable to Petitioners' tract underscore the necessity for creating lots in order to obtain approval of final plans and, in addition, Petitioners cannot sell any portion of their tract without subdividing to create lots. As Mr. Fox revealed in his testimony, subdividing the entire tract in accordance with the zoning districts therein was a logical and necessary step in the development process, and the Board could not have failed to realize

this. In view of the plain requirements of the Township's own ordinance, it is simply not credible to suggest that the Board did not know that Petitioners would have to subdivide their tract.

Knowing that Petitioners would be submitting subdivision plans, the Board predicated its fees on a criteria intended to extract maximum tribute. Whereas the prior schedule of the Township had been predicated on the number of lots created, the new schedule changed the basis for computing fees to the number of dwelling units and number of acres, and it is clear that Petitioners' land is the sole tract in the Township zoned for multi-family dwelling units which has not already been developed, with the possible exception of seven acres elsewhere in the Township. Petitioners' tract is also the largest in the Township intended for development. The new bases for computing subdivision fees were, therefore, uniquely applicable to the Chesterbrook development.

The other fee schedule adopted by the Board in January, 1976, is equally harsh in its effect on the present development. These fees apply to the submission of all development plans which must be reviewed through hearings before the Board of Supervisors or Zoning Hearing Board, or which require site plan review by the Planning Commission. This schedule applies to almost every final development plan which Petitioners are required to submit, including all plans for multi-family development and office park development. The schedule is also predicated on acreage and number of dwelling units, with the result that Petitioners will be required to pay fees of at least $338,525 over the period during which plans are submitted. The Board of Supervisors does not dispute that they knew of the extent to which this schedule would govern plans required of Petitioners, nor do they dispute that they knew the number of

acres and number of dwelling units in Petitioners' development plans. The adoption of these new exorbitant fee schedules at precisely the time that Petitioners were proceeding with final plans, and the selective, devastating impact of these schedules on Petitioners, are not matters of coincidence.

The Board of Supervisors argue that the subdivision fee schedule which they adopted is in line with the subdivision fees of other municipalities, and that the subdivision fee of $22,000 charged by Tredyffrin Township to review Petitioners' subdivision plans can be compared to fees of $26,000, $55,000 and $55,000 which allegedly would have been charged by Lower Merion Township, Abington Township and Cheltenham Township, respectively. This is simply not the case.

In order to avoid erroneous assertions concerning fees of other townships, dehors the record, we required that any comparison to a fee schedule of another township be based upon competent evidence. As a result of this ruling, the fee schedules of these townships, as well as a number of other townships, have been stipulated to and entered into the record. Under the Subdivision Fee Schedule of Lower Merion Township, Petitioners would have paid a fee of $295 for their residential lots, and $12,700 for their nonresidential lots (which comprise a total of approximately 125 acres) and perhaps a final plan fee of $285, for a total and maximum fee of $13,505. Under the Abington Township subdivision fee schedule, Petitioners would have been required to pay a fee of $15 plus $1 per lot, and perhaps a $25 preliminary plan fee, or a maximum total fee of $59. Under the Cheltenham Township subdivision fee schedule, Petitioners would have been required to pay a fee of $25 plus $2 per lot, and possibly a $50 preliminary plan fee, or a maximum of $113.

In portraying the "fees" of Abington Township and Cheltenham Township, Tredyffrin Township has included as "fees" an amount which must be deposited to cover the cost of inspecting improvements as they are constructed, which amount, according to express provisions of the respective ordinances, is returned if not spent. The inspection fee is computed on a $10 per hour basis, and it seems clear that these charges are unrelated to subdivision review. Moreover, these charges do not appear to be "fees" at all. By comparison, the $22,000 subdivision fee required from Petitioners by Tredyffrin Township did not include the identical $10 per hour inspection charge made by Tredyffrin Township.

With respect to Lower Merion Township, the Board has included as "fee" an amount of approximately $13,000 in the form of an item designated as "Land Development Permit." Based on discussions which Petitioners and the Township staff had with officials of Lower Merion Township, the parties included in the Stipulation Re: Fee Schedules, the following provision:

> The parties to this Stipulation further agree that Section 1013.1 entitled 'Land Development Permit,' would not apply to the subdivision or improvement construction plans submitted by Petitioner-Landowners in the present case.

The Board's inclusion of this charge was therefore unjustified.[2]

---

[2] It is possible that the extra $13,000 resulted from including a fee of $13,000 under Section 1015 of the Lower Merion Township ordinance, which concerns "lot location plans." However, the Board had already included a $13,000 fee under the Preliminary Plan section of the ordinance, and Section 1015.4 provides that the fee for a lot location plan is limited to $25 where the plan conforms to an approved preliminary plan.

The actual subdivision fees which would have been required for review of Petitioners' subdivision plans by each of the seven townships bordering on Tredyffrin Township are set forth in Finding of Fact No. 27. In addition, the fees which would have been charged by certain other townships are set forth in Finding of Fact No. 26. These fees are easily computed by applying the fee schedules of these townships, attached to the Stipulation Re: Fee Schedules, to Petitioners' nineteen lot subdivision. The comparisons show that Tredyffrin Township's subdivision fee, as applied to Petitioners' plans, is approximately 100 times greater than the mean subdivision fee of the other townships, and is more than fifteen times greater than the average fee of the other townships.

Reiterating, fees charged by a municipality for services it renders in performing its official functions must be based on the costs of the municipality in performing that service. *Warner Bros. Theatres, Inc. v. Pottstown Borough,* 164 Pa. Superior Ct. 91, 63 A.2d 101 (1949); *Pottsville Borough v. Pottsville Gas Company,* 39 Pa. Superior Ct. 1 (1909); *University Park Cinemas, Inc. v. Borough of Windber,* 59 D. & C. 2d 726 (1972). A municipality cannot use its power to charge fees for issuing licenses or permits for the purpose of raising revenue for general governmental purposes and to this general proposition we must add, neither may a municipality impose fees for the purpose of frustrating without legitimate cause the activity for which the fee is charged.

3. *Rejection of Subdivision and Improvement Construction Development Plans.*

The Planning Commission and Board of Supervisors' review with respect to the Subdivision Plan was a complete departure from the provisions of the Tredyffrin Township Subdivision Ordinance, which provide for Planning Commission review within thir-

ty days and decision by the Board of Supervisors within fifty days. In the normal course of events, both the Planning Commission and the Board of Supervisors discuss possible objections with the developer for the purpose of resolving problems and areas of uncertainty. With respect to Petitioners' subdivision application, there was no indication whatsoever of any objection to the plans until the Planning Commission announced that it was recommending disapproval some seventy-eight days after the plans had been submitted and only two working days prior to the last scheduled meeting of the Board at which the plans could be rejected. The Planning Commission bottomed its resolution upon two "technical objections." Petitioners modified their plans to satisfy the objections prior to the Board's meeting, in spite of their open disagreement with these objections. The Board refused to consider the modified plans on the basis that the modifications were submitted too late and proceeded to reject the plans on the two alleged "technical errors" cited by the Planning Commission.

In reviewing the massive record before us, we cannot find any justification by the Board defending the technical error that the plans contained more information than required. The practical approach which should have been followed by the Board was to accept the plans and act upon them, considering the additional information contained therein to be mere surplusage. Apparently, the Board had no intention of acting upon these applications, for refusal, based upon di mimimus surplusage, cannot be rationally justified.

With respect to the other alleged "technical error," i.e., that three of the nineteen lots must be further subdivided because they are bisected by roads, the Board requests a factual finding and legal conclusion that its position is correct, without suggesting

any basis for such a finding. Indeed, the Township staff member who propounded this objection admitted that there was no basis for the objection in the Township Subdivision Ordinance or Zoning Ordinance, and no basis has been suggested during the entire course of these proceedings. Moreover, the creation of the additional lots required by the Board would have no relevance to development of the tract or the transfer of ownership, and would therefore be inconsistent with the Subdivision Ordinance definition of lot as "a parcel of land intended for transfer of ownership or building development."

The procedures involved in the submission and review of the four sets of improvement construction plans herein are not disputed by the Board of Supervisors. During the preparation of these improvement construction plans, Petitioners had many meetings with the appropriate members of the Tredyffrin Township staff to discuss and agree upon applicable township requirements. When a developer undertakes the preparation of major development plans, the normal practice in most townships includes this form of meet and discuss consultation. At these meetings between the Township staff and developer, agreements were reached concerning the proper application of Township regulations to Petitioners' proposed plans, and Petitioners proceeded accordingly in preparing their plans. Among the matters upon which the developer and Township staff agreed were the proper definition of the major internal roads (which, in turn, defines the dimensions and other requirements of the roads), and the paving specifications for the roads. Agreement concerning paving specifications was necessary because the specification in the Subdivision Ordinance was obsolete, because it required the use of a "black top" material which was unavailable and, in addition, undesirable from an engineering viewpoint. Testi-

mony adduced at the hearing showed that the Township has not followed its own paving specifications for a number of years, and has regularly approved alternate paving specifications in place of its obsolete specifications.

Improvement construction plans were submitted in June and early July, 1976. Near the end of July, 1976, the Board retained an engineer, John E. Houtman, to review the improvement construction plans submitted by Petitioners instructing him to measure the plans against the Township Subdivision Ordinance. It is noteworthy that Mr. Houtman was not given any information concerning the substance of the many meetings between the Township staff and developer, nor was he informed of the understandings reached in these discussions with respect to the use of alternate materials, etc.

Not surprisingly, the Houtman report found that the improvement construction plans did not conform to the Township paving specification. The report acknowledged a lack of precise understanding as to the applicable definition for Chesterbrook Boulevard and stated that this was, in fact, a land planning matter and was outside the scope of this review. Based on his assumptions, Mr. Houtman as well questioned the dimensions of Chesterbrook Boulevard. The final matter raised by Mr. Houtman in his report was the cartway width of two cul de sac streets in the R-1 District. Concerning these streets, Mr. Houtman noted that "the question arises as to whether the cartway should be 27 feet, instead of 24 feet as shown." In fact, the dimension of these streets in Petitioners' plans conformed to the dimensions of the streets on the approved subdivision plans, as required by the Subdivision Ordinance. The report concluded that "[t]his issue of required and acceptable street paving standards should be clarified." In addition, the

Board of Supervisors was twice put on notice by the developer of the direct conflict between the above referenced comments of Mr. Houtman and the contrary understandings of the Township staff and developer. In spite of the obvious need for clarification and inquiry, the Board used Mr. Houtman's comments as a basis of rejecting all of Petitioners' improvement construction plans. There can be no other conclusion but that failure of the Board, or its staff, to inform its consulting engineer, employed to review Petitioners' plans, of the verbal understanding modifying seemingly applicable Township standards of review, and subsequent reliance upon conclusions of that engineer as a basis for rejection of plans is further evidence of the Township's intent to frustrate development.

And finally, like its action upon Petitioners' subdivision plans, the Board of Supervisors waited to act until its last regularly scheduled meeting at which the plans could be rejected. Further, these rejections coincided with the advertisement of the Board's latest ordinance to rezone Petitioners' tract.

In light of the fact that the record establishes that rejections of this type were extremely rare prior to the Chesterbrook applications, this Court cannot help but find a lack of good faith by the Township in these dealings with Petitioner.

4. *Repudiation of Prior Approvals of Plans and Permits.*

The Board of Supervisors apparently denies that improvement construction plans of Petitioners were approved in 1972 and 1973 and asserts that such plans were never in fact submitted. The Board asserts that the building permits were issued only ''for the purpose of putting the 'Chesterbrook case' in the proper legal posture so that the matter could be litigated before the Zoning Hearing Board in 1972,'' and finally,

the Board argues that Petitioners' abandonment of work on their tract in the early part of 1976 was not the result of the Board's revoking prior approvals. We cannot agree.

We are unable to accept the proposition that Petitioners never submitted improvement construction plans prior to 1976. Exhibit PD-10, A through C, shows plans stamped with official Board approval and dated 1972. These plans are described as having been approved in the Board of Supervisors' minutes for the meeting convened on August 14, 1972. These plans are both subdivision plans and improvement construction plans and set forth the storm water control systems; the sanitary sewer systems; the design of the roads, including cross-sections and specifications for paving; concrete sidewalks; and other basic improvements. Further, Tredyffrin Township has entered into an Escrow Agreement with Petitioners, dated September 25, 1972, which guaranteed the completion of these improvements. This Agreement specifically refers to the approved plans. In addition, the Township issued building permits for twelve lots shown on the approved plans. Even the Township Manager was compelled to admit the fact that Tredyffrin Township does not enter into an escrow agreement to guarantee subdivision improvements, or issue building permits, in the absence of approved improvement construction plans. Moreover, the record shows that there were additional improvement construction plans submitted by Petitioners in 1972 and 1973 in connection with the subdivision approvals given by the Board of Supervisors in those years.

We are also unable to accept as credible the Board's position that the building permits were issued solely to place the Chesterbrook case in a proper legal posture for litigation before the Zoning Hearing Board in 1972. Eleven of the twelve permits issued to Pe-

titioners were issued on June 15, 1973. By this time the Zoning Hearing Board had completed its hearings in the present cases, and had issued its opinion. In fact, it seems that the building permits were issued because Petitioners had obtained all the necessary prior approvals, including approvals of improvement construction plans.

The Board's argument that its revocation of prior approvals and permits was not the cause of Petitioners' ceasing work on their tract in the early part of 1976 is also contrary to the uncontradicted evidence. The Board of Supervisors' notification to Petitioners that they could not proceed to construct improvements naturally resulted in a cessation of construction activities. The Board's suggestions that Petitioners did not proceed because they would not guarantee improvements for Valley Forge Road and because of confusion concerning their Erosion and Sediment Control Permit is not credible, and we find these situations to have had little or no effect on proceeding with development of the tract. Petitioners did not guarantee improvements on Valley Forge Road because this would have been a meaningless act so long as Petitioners could not construct improvements on their tract. With respect to Petitioners' Erosion and Sediment Control Permit, the confusion as to whether the permit expired existed for a total of only ten days, and was fully resolved by a letter from the Department of Environmental Resources, dated February 23, 1976, which confirmed the continued validity of the permit.

In view of the foregoing, we find no difficulty in holding that the course of conduct of renunciating prior approvals is a prime exhibition of bad faith explicitly contradicting our prior Order.

## CONCLUSION

Based upon the foregoing, evidencing acts of the Township, we find a deliberate, pervasive plan and

intent exhibited to thwart development of the Chesterbrook tract.. Given this lack of good faith and compliance with this Court's adjudication, we grant the Petition to Enforce Judgment.

ORDER

AND Now, this 22nd day of December, 1976, it is hereby ordered as follows:

1. That the Petitioners' subdivision plans for their tract, which were rejected by the Board of Supervisors at its August 23, 1976 meeting, are approved, and it is further ordered that the Board of Supervisors and appropriate Township officials take any and all action required by law to certify and record such approval, and to have the plans recorded by the Recorder of Deeds in Chester County;

2. That Petitioners' plans for Chesterbrook Boulevard, which were rejected at the meeting of the Board of Supervisors on August 23, 1976, are approved, and further that the Board of Supervisors issue a permit evidencing such approval and authorizing construction of Chesterbrook within seven (7) days of this Order;

3. That Petitioners' plans for the improvements associated with Section I of the R-1 subdivision, which were rejected by the Board of Supervisors at its August 23, 1976 meeting, are approved, and further that the Board of Supervisors issue a permit evidencing such approval and authorizing construction of the improvements shown in these plans within seven (7) days of this Order;

4. That Petitioners' plans for the improvements associated with Section II of the R-1 subdivision, which were rejected by the Board of Supervisors at its September 13, 1976 meeting, are approved, and further that the Board of Supervisors issue a permit evidencing such approval, and authorizing construc-

tion of the said improvements shown on these plans within seven (7) days of this Order;

5. That Petitioners' plans for Duportail and Lee Roads, which were rejected by the Board of Supervisors at its September 13, 1976 meeting, are approved, and further that the Board of Supervisors issue a permit evidencing such approval and authorizing construction of Duportail and Lee Roads within seven (7) days of this Order;

6. That Tredyffrin Township remit forthwith to Petitioners the difference between the $22,000.00 filing fee that Petitioners were required to pay with the subdivision application and the fee which would have been required under the prior fee schedule;

7. That the new fee schedules concerning land development plans which were adopted by the Board of Supervisors in January, 1976, are unlawful and null and void;

8. That the Board of Supervisors forthwith undertake to adopt new fee schedules which bear undeniable and appropriate relation to services rendered in performing official functions of review, said fee schedules to be effective prospectively;

9. That the Board of Supervisors of Tredyffrin Township shall cease and desist from acting to prevent development of Petitioners' land under the zoning upheld by this Court's prior adjudication;

10. That Petitioners may re-petition this Court for effective relief in the event that the Board of Supervisors takes further action to prevent development of this land.

11. That the record in this case shall be retained by this Court until further Order to facilitate consideration of any additional motions which may *in futuro* be necessary to prevent a nullification of our prior adjudication.