Reese Brothers Coal & Clay Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued September 12, 1980, before Judges MEN-CER, CRAIG and WILLIAMS, JR., sitting as a panel of three.

*Carl A. Belin, Jr., Belin, Belin & Naddeo,* for petitioner.

*Douglas R. Blazey,* with him *Gary Waxman,* Assistant Attorney General, for respondent.

OPINION BY JUDGE CRAIG, October 7, 1980:

This petition to review a decision of the Environmental Hearing Board (EHB), presented by Reese Brothers Coal & Clay Company (Reese), seeks a mining permit from the Pennsylvania Department of Environmental Resources (DER) without Reese submitting a written consent of the landowner (current ad-

ministrative form entitled "Supplemental C") under Section 4(a)(2)(I) of the Surface Mining Conservation and Reclamation Act[1] which as amended by Act No. 133 of 1963[2] and Act No. 147 of 1971,[3] reads:

> *Except where leases in existence on the effective date of this amending act do not so provide or permit,* the application for a permit shall include, upon a form prepared and furnished by the department, *the written consent of the landowner to entry upon any land* to be effected by the operation by the operator or by the Commonwealth or any of its authorized agents *within a period of five years after the operation is completed* or abandoned *for the purpose of reclamation,* planting, and inspection or for the construction of any such mine drainage treatment facilities as may be deemed necessary by the secretary for the prevention of stream pollution from mine drainage. (Emphasis added.)

### 1. LEASE IN EXISTENCE

Because Reese holds under a lease first made, for fire clay only, in 1912, whereby the landowner granted the coal mining rights by a supplemental lease in 1919, Reese claims to have a lease which was "in existence" on or before January 1, 1964, the effective date of the 1963 amendment, and therefore also before January 1 of 1972, the effective date of the 1971 amendment.[4]

---

[1] Act of May 31, 1945, P.L. 1198, §4(a)(2)(I), *as amended,* 52 P.S. §1396.4(a)(2)(I).

[2] Act of July 16, 1963, P.L. 238, §2.

[3] Act of November 30, 1971, P.L. 554, §5.

[4] The 1964 effective date applied to bituminous coal leases; coverage was not extended to anthracite coal and other minerals until the 1972 effective date. Although this case appears to involve a bituminous lease, and therefore the 1964 date, the EHB decision, and the DER interpretation noted by the EHB, have referred to the 1972 date.

The EHB here adopted a formal conclusion agreeing that leases in existence before January 1, 1972 are exempt, stating that the "Surface Mining Conservation and Reclamation Act . . . specifically exempts from its coverage, leases in existence prior to January 1, 1972, the effective date of Act 147 of 1971, P.L. 554."[5]

Indeed, that view has constituted DER's own administrative interpretation until recently. As the EHB decision also stated:

> DER has not required a consent form, known as Supplemental 'C', to be signed by the lessor on prior applications where there was a lease which predated the effective date of Act 147 of 1972, P.L. 554, i.e., January 1, 1972. Based on a revision in its interpretation of the Supplemental 'C' requirement, sometime in 1979, DER began to deny permit applications which did not contain the lessor's signature consenting to re-entry of the premises by the operator for reclamation purposes for five years after termination of operations.

If the statutory section were ambiguous, that history of administrative interpretation by DER would have weight in resolving the ambiguity.[6] However, because we agree with the EHB that the language is not ambiguous, DER's long-standing administrative interpretation, reflected also in the forms it prepared,[7] is only confirmatory.

---

[5] As discussed below, the EHB nevertheless affirmed DER's permit refusal and held Reese's lease not exempt, on the basis that "an assignment . . . as to either the original lessor or lessee," after the pertinent date, eliminates the exemption.

[6] *Federal Deposit Insurance Corp. v. Board of Finance and Revenue*, 368 Pa. 463, 84 A.2d 495 (1951) ; 1 Pa. C. S. §1921(c)(8).

[7] We have been advised by both briefs that DER's mining permit application forms have heretofore provided a space to check if the applicant is "not filing Supplemental C because lease was in

Even though the words thus confirmed by EHB and DER are plain, we will nevertheless consider fully the new view now earnestly espoused by DER.

DER's new administrative position is that the exempt class is not so broad as to embrace *all* leases in existence on January 1, 1972. One must agree with that statement because the exempt class clearly includes only those "leases in existence" on the effective date which, according to the meaning for which DER contends, "do not provide" for or "permit" *any further written consent of the surface landowner to post-mining entry.* (Emphasis added to indicate verbatim the expression put forth by DER in its brief.)

Reese's lease, being entirely silent on the point, is incontestably one which, in the very terms on which DER insists, was in existence on the effective date of the act and does not provide for or permit any further written consent of the surface landowner to post-mining entry. In the exact words of the statutory section, with respect to "the written consent of the landowner to entry . . . for the purpose of reclamation," this lease, "in existence on the effective date" of the amending acts, did "not so provide or permit."

However, DER contends that we cannot read the words of the statute as they are written, urging judicial interpolation based upon the hypothesis that, because the reclamation requirement began with the 1963 amendment, no lease in existence before the commencement of debate over that 1963 amendment could possibly contain any reference to a landowner's written consent to post-mining entry.

DER offers no proof or authority for the bald assertion of that negative proposition, which elsewhere in the brief is modified to the claim that there would

existence prior to January 1, 1972." As indicated in the text of this opinion, no weight is assigned to the point; there is insufficient evidence to support an estoppel.

be "exceedingly few" such leases before 1963. DER has not shown any reason why a lease drawn up in any era could not contain some provision providing for a written consent to re-enter.

Thus DER is here asking for an interpretation tantamount to judicial legislation, to read the statute as exempting only

—leases negotiated with an awareness of the pendency of reclamation legislation

—and which, moreover, in DER's words, are leases "specifically stating that no further consent of the surface landowner to reentry was required."

In other words, where the law exempts leases which "do not" provide for written landowner consent to re-entry, DER wants us to construe the law as exempting leases which *do* provide for re-entry without a written consent being required.

In view of the sound purpose of the reclamation requirement, we might well wish that the exemption had been enacted as DER argues, exempting only those leases which do not *require* any further written consent of the landowner for the operator and the Commonwealth to gain entry for reclamation. But the statute essentially exempts leases which do not *provide* for re-entry consent, the virtual opposite of exempting those which do not *require* re-entry consent. Moreover, as the EHB stated, "such an exemption would change nothing and would also presuppose that the parties anticipated that a law would be passed with the requirements that appeared" in the amendments.

The courts have often held, as codified in the terms of 1 Pa. C. S. §1921(b), that, when the words of a statute are clear and free from ambiguity, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." *See City of Pittsburgh v. Royston Service, Inc.*, 37 Pa. Commonwealth Ct. 394, 390 A.2d

896 (1978). Well-intended judicial revision of legis-lative expression, as enacted by the elected lawmakers, obviously poses a real threat to predictability and uni-formity of interpretation, putting us even farther away from the ideal of a government of laws.

DER's last contention on this point is drawn from the legislative history, pointing out that the House of Representatives defeated an amendment to exempt *all* pre-act leases, *i.e.*, apply the written consent require-ment only to land "hereafter leased." However, as pointed out above, our interpretation of the final and present language does not exempt *all* pre-act leases and is therefore not inconsistent with the legislative rejection of a total pre-act exemption. As to the un-persuasiveness of the legislative history argument, we are again in agreement with the EHB.[8]

## 2. ASSIGNMENT OF LEASE

The final point, relating to whether Reese is en-titled to a mining permit, turns upon the fact that Reese was not the original lessee of the coal grant in 1919. The original lessee assigned its lessee interest to General Refractories Company in 1935, and that company sublet to Reese in a series of agreements, the latest being dated in 1977.

The fact that Reese was not the original lessee was the EHB's basis for denying the permit, concluding that where there has been "an assignment or a change in ownership as to either the original lessor or lessee" after the amendment date, DER may require the writ-ten consent form as a condition for a mining permit.

---

[8] In addition to recognizing that legislative rejection of the exemption of all pre-act leases does not oust the possibility of ex-empting some pre-act leases, the EHB noted that DER's interpreta-tion "requires us to ascribe an unnecessary obtuseness to the Act. It is difficult to conceive of the legislature . . . mandating such a limited exclusion which hardly makes any sense."

Neither the EHB nor the DER offer any authority for that proposition.

The statute clearly places the exemption on the basis of the existence of the lease. The lease's scope and the obligations of the lessor and lessor's successors are not changed by mere subsequent assignment or subletting by original and successor lessees.

The point is well expressed by the statement in the EHB's own opinion that:

> We are convinced that the Act employing the language 'Except where leases in existence on the effective date of this amending act. . .' was intended to protect a lessee from having to again approach his lessor and hope that he could obtain a signature without having added financial or other burdens placed upon him and risk the denial of a mining permit unless the owners' demands, no matter how exorbitant, were met.

The EHB was referring, of course, to the situation of the original lessee, but the stated proposition is little affected by transfers among lessees; no lessee transferor can give any lease different from the one which the transferor has had. The same rationale applies; like the original lessee, the successor lessee would have to approach the lessor or lessor's successors, risking the denial of a mining permit unless the demands of the lessor or successors, no matter how exorbitant, are met.

We recognize the implicit contention as to successor lessees—that, where a lessee interest has been assigned after the statutory amendments, the assignee's awareness of the changed law should require the assignee to assume the burden of renegotiation with the lessor, or else to spurn the assignment. However, this argument overlooks the law's literal and plain exemption of ''leases in existence,'' as distinguished from

referring to existing lessees, and the lease held by the assignee is the same lease as that granted to the original lessee. Thus, the legislature's choice of terms provides no encouragement for the adoption of an interpretation which would inhibit the alienability of leases.

Moreover, the EHB's distinction is even more inappropriate when considered in relation to transfers of lessee interests by operation of law.

We therefore must reverse the EHB's dismissal of Reese's appeal.[9]

### 3. RELIEF

A cautionary note is warranted by DER's contention that, if we reverse the EHB, we should not order issuance of a mining permit, as sought by Reese, but should remand the case to DER, to determine "whether or not the permit application is deficient in any other respect."

The record does not definitely indicate that the written consent (Supplemental "C") had become the only obstacle to issuance of a mining permit. A letter from the director of the Bureau of Surface Mine Reclamation states that the department "has completed its review of your mining permit application" and that, based upon that review, "we have determined that the mining permit cannot be issued without a Supplemental 'C' . . ."; however, the record does not confirm that all other requirements have been fulfilled.

Therefore we will direct that the requested mining permit be issued without the submission of a Supplemental "C" form, but subject to all other applicable requirements of law, with a caveat to DER that we have, in the past, entertained applications for enforce-

---

[9] Our conclusions make it unnecessary to consider Reese's challenge of the constitutionality of DER's current interpretation.

ment of our orders where the permit-issuing agency has evidenced obstructionism by devising successive new hurdles. *Raum v. Tredyffrin Township Board of Supervisors,* 29 Pa. Commonwealth Ct. 9, 370 A.2d 777 (1977).

ORDER

AND Now, this 7th day of October, 1980, the order of the Environmental Hearing Board dated September 27, 1979, at its Docket No. 79-076-W, is reversed and this matter is remanded with the direction that the requested mining permit (No. 539-10A-2) be issued to Reese Brothers Coal and Clay Company without the submission of a Supplemental "C" form, subject to all other applicable provisions of law.

Judge WILLIAMS, Jr. dissents.