Eleanor MORRIS, Appellant,

v.

**SOUTH COVENTRY TOWNSHIP BOARD OF SUPERVISORS.**

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 2003.
Decided Oct. 24, 2003.
Rehearing Denied Dec. 22, 2003.

Robert J. Sugarman, Philadelphia, for appellant.

Louis J. Colagreco, Jr., Exton, for appellee.

BEFORE: FRIEDMAN, Judge, COHN, Judge, MIRARCHI, JR., Senior Judge.

OPINION BY Judge COHN.

Eleanor Morris appeals the preliminary approval by the South Coventry Township (Township) Board of Supervisors (Board) of a subdivision and land development, plan submitted by Heritage Building Group (Heritage) and Eva Symons, that was affirmed by the Court of Common Pleas of Chester County.[1]

Pertinent facts are as follows. Symons is the record owner of 81.42 acres located along Pennsylvania Route 100, south of Pennsylvania Route 23 and bisected on the southern edge by Daisy Point Road (Symons Farm Tract). Heritage is the equitable owner of the Symons Farm Tract.

The 81.42 acres of the Symons Farm Tract are comprised of approximately 66.861 acres located in the Agricultural (AG) zoning district, and 14.559 acres located in the Commercial (C) zoning district.[2] Heritage proposes to subdivide and develop the acres zoned AG into 46 residential lots as follows: 44 lots designated single-family residential situate on approximately 33 acres, and 2 lots (numbers 45 and 46) designated as open space on the other 33 acres. Heritage also proposes to develop the acres zoned C into two independent lots traversed by a proposed new public road: one lot of 8.1 acres will house two single-story buildings totaling 27,900 square feet with 166 parking spaces, and one lot of 4.3 acres will house a two-story building totaling 25,000 square feet with 113 parking spaces.

Symons and Heritage, through The Grafton Association, the engineering firm responsible for the plan, filed an "Application for Review of a Preliminary Plan" with the Township for the AG district parcel and one for the C district parcel, noting on each the acreage of the associated parcel. The Board approved the plan and confirmed the approval by letter to Heritage's counsel, dated April 17, 2002.

---

1. In essence, the Township concurs with the brief submitted by Heritage and Symons, the Intervenors. Therefore, the arguments of the three parties, jointly referred to in this Opinion as Appellees, will be presented together.

2. The Township zoning ordinance describes two types of strictly commercial zoning districts: GC (General Commercial) and CI (Commercial–Industrial). The commercial references in the record are given a notation of "C". Because it appears that the commercial district at issue in this case is akin to a GC district, where references to the zoning ordinance as applies to the commercial district are necessary, those in Article VIII— General Commercial District Provisions—will be used.

 Morris, whose property abuts the Symons Farm Tract to the south, timely filed a Land Use Appeal. Heritage timely filed a notice of intervention. Thereafter, the Solicitor of the Township filed the record made before the Board with the trial court. Following a review of briefs and oral argument, and without taking additional testimony or evidence, the Court of Common Pleas of Chester County (trial court) denied Morris' land use appeal and affirmed the action of the Board. Morris subsequently filed this appeal raising seven issues; each is an objection to a determination made by the Board with respect to the plan's compliance with the Township Zoning Ordinance (Zoning Ordinance), Subdivision and Land Development Ordinance (SALDO), the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101—11202, and/or the Pennsylvania State Constitution. We will address these issues seriatim.[3]

Morris first claims that the open space is insufficient under the Zoning Ordinance to qualify as an open space subdivision. In order to qualify under the open space development option, which is a use permitted by right in the AG District,[4] the Zoning Ordinance requires at least 50% of the "gross tract area" to be maintained as

"restricted open space."[5] The Zoning Ordinance defines "gross tract area" as "[a]ll land contained within the legal property lines of a tract."[6] Because the property was not previously subdivided to exclude the commercial portion, Morris argues that the gross tract area includes the *entire* 81.42 acres. Fifty percent of that, or 40.71 acres, must be maintained as "restricted open space" pursuant to the Zoning Ordinance.

 The Zoning Ordinance does not define "tract." It does, however, define "lot" as a "tract or parcel of land intended as a unit for lease, transfer of ownership, or development."[7] Heritage's plan proposes subdivision of the property along the zoning district boundary in conformity with the underlying zoning districts; one lot or tract will be developed under the Open Space Development Option which is permitted in an AG district, and the second lot or tract comprised of land located in the C Commercial district will be developed in accordance with commercial zoning regulations.[8] Morris has not provided any authority to support her claim that Heritage is not permitted to subdivide the property in accordance with the MPC and the SALDO so that it may be developed in accordance with the Zoning Ordinance. To read into the Zoning Ordinance a restric-

3. In a land use appeal, where a full and complete record was made before the Township and the trial court took no additional evidence, this Court's scope of review is limited to determining whether the Board committed an abuse of discretion or an error of law. *Wolter v. Board of Supervisors of Tredyffrin Township,* 828 A.2d 1160, 1162 n. 4 (Pa. Cmwlth.2003). A conclusion that the Board abused its discretion may be reached only if its findings are not supported by substantial evidence. *Centre Lime and Stone Company, Inc. v. Spring Township Board of Supervisors,* 787 A.2d 1105, 1108 n. 2 (Pa.Cmwlth.2001), *petition for allowance of appeal denied,* 568 Pa. 740, 798 A.2d 1291 (2002). Substantial evidence is such relevant evidence as a rea-

sonable mind might accept as adequate to support a conclusion. *Id.*

4. Section 401.

5. Section 404(2)(B).

6. Section 201(26).

7. Section 201(37).

8. Residential development under the Open Space Development Option is not permitted in an area zoned commercial, *see* Sections 401 and 801 of the Zoning Ordinance, nor is it proposed under Heritage's plan.

tion that split-zoned property may not be subdivided prior to development is to imply a restriction that was never expressed nor intended. As the trial court succinctly stated:

The property owner could have presented a plan subdividing the property into two (2) lots divided along the zoning district line, obtained approval for that subdivision and then presented a second plan for development of what would now be a separate lot located wholly within the district permitting development pursuant to the Open Space Development Option. The result would be the same. No purpose would be served by requiring such a two step process.

(Trial Court Opinion, March 6, 2003, pp. 3–4.)

Further, contrary to Morris' contention that the gross tract area includes the entire acreage, the Board agreed with Heritage's subdivision plan and, thus, approved an exclusion of 16.253 acres from the gross tract area based on the subdivision of the property. It deducted the total acres zoned commercial [14.559] and the acres needed for a right-of-way into the residential area [1.694] from the gross tract area. Therefore, according to the Board, Heritage was required to provide for restricted open space of 32.584 acres ( [81.42—14.559—1.694] × 50%) in the development. However, the plan proposed by Heritage provides 36.369 acres of open space in conjunction with its proposed residential development of 65.167 acres in the AG district [9] under the open space development option. This will provide 55.809% of restricted open space area which exceeds the 50% requirement of 32.584 acres under section 404(2)(B) of the zoning ordinance.

Morris also claims that most of the alleged "open space" does not qualify as "restricted open space" since it is comprised essentially of the lawns of two large residential lots.[10] While she agrees that open space may be privately owned,[11] Morris emphasizes that the use of restricted open space for residential purposes is not permitted under the zoning ordinance,[12] and is also inconsistent with the agricultural zoning classification of the area in question.

■ Morris is confusing "ownership" with "use." There is no restriction in the Zoning Ordinance precluding ownership of open space by private residents. In fact, Section 707(6)(A) of the zoning ordinance states that "[r]estricted open space may be retained in ownership by the Applicant or may be transferred to other private parties subject to compliance with all standards and criteria for restricted open space herein." (Emphasis added.) Further, Section 707(6)(B) of the Zoning Ordinance states that "[a]ll or portions of the designated open space, where permitted by the Board [], *may be included within or divided among one or more of the individual lots.*" (Emphasis added.) Areas designated for open space purposes may

---

**9.** This acreage is calculated by subtracting 1.694 acres right-of-way from the 66.861 acres in AG district.

**10.** The Open Space Management Plan, revised May 11, 2001, describes the total open space of 41.88 acres as follows: lot number 45, 19.46 acres, privately owned; lot number 46, 13.28 acres, privately owned; and, common open space, 9.14 acres, owned, managed and maintained by the Symons Farm Development Homeowner's Association. (Open Space Management Plan, revised May 11, 2001, pp. 2–3.) It should be noted that approval of the Open Space Management Plan is deferred until final plan application. (Preliminary Approval Letter from Township, April 17, 2002, no. 2.)

**11.** Section 707(6).

**12.** Section 706(2).

be used for crop or pasture land; wood-land, meadow, wetland, or similar conservation-oriented area; public, common, or private park or outdoor recreation area; land application of wastewater; or accessory structures.[13] Here, Heritage's plan explicitly states that the proposed open spaces, "comprised of meadow, floodplain, wetlands and lesser amounts of wooded areas[,]" . . . are to be left undisturbed and in their natural state." (*See* Open Space Management Plan, revised May 11, 2001, p. 2.) Ongoing maintenance and further development of these areas will be restricted by deed. *Id.* at 3.

Second, Morris claims that the application should have been denied because Heritage does not own the land needed to provide required street frontage. Morris argues that the Board abused its discretion when it approved the development conditioned upon final approval of the acquisition of the needed property. She cites to *Malone v. West Marlborough Township Board of Supervisors,* 145 Pa. Cmwlth. 466, 603 A.2d 708 (1992), *Dobrinoff v. Board of Supervisors of Franklin Township,* 136 Pa.Cmwlth. 282, 582 A.2d 1156 (1990) and *County Builders, Inc. v. Lower Providence Township,* 5 Pa. Cmwlth. 1, 287 A.2d 849 (1972), for the proposition that, without proof of ownership, a board cannot approve a preliminary subdivision plan because an applicant does not have standing to apply for subdivision of land it does not own. She further argues that the definitions of "landowner," "developer" and "applicant" in the SALDO are limited to those persons who actually own the land, persons contracted to purchase the land, or lessees authorized under the lease to exercise the rights of the landowner.[14]

 A year *after* submission of the original plan and application, it was determined that a portion of the proposed deceleration lane would be located outside of the legal right-of-way. (*See* Minutes, South Coventry Township Combined Planning Commission and Environmental Advisory Council Meeting, February 18, 2002, p. 2.) Thereafter, an easement and an additional right-of-way were indicated on the plan for the roadwork necessary outside the legal right-of-way. The Board, in granting preliminary approval, made the "acquisition of [an] additional right-of-way for Route 100 improvements in accordance with the referenced plans" a *condition* of final approval. (*See* Township Approval Letter, April 17, 2002, no. 6.) The Board, thus, utilized its significant discretionary authority: *i.e.,* where a preliminary subdivision plan fails to comply with the substantive requirements of the subdivision ordinance, its rejection or conditional approval is within the discretion of the governing body. *Herr v. Lancaster County Planning Commission,* 155 Pa.Cmwlth. 379, 625 A.2d 164 (1993), *petition for allowance of appeal denied,* 538 Pa. 677, 649 A.2d 677 (1994). A governing body may attach such reasonable conditions in approval of a land development plan as the applicant will accept.[15] *Ice v. Cross Roads Borough,* 694 A.2d 401 (Pa.Cmwlth.1997), *petition for allowance of appeal denied,* 549 Pa. 730, 702 A.2d 1062 (1997). A

---

13. Section 706(2).

14. SALDO, Section 201.

15. Here, the Township's SALDO provides procedures for its review of preliminary plans, and the subsequent attachment of conditions thereto. (SALDO, Section 405(B)(2).)

Any final plan must comply with the preliminary plan, and the conditions as attached, and must include submission of all required permits from agencies having jurisdiction over ancillary matters necessary to effect the subdivision or land development, such as PennDOT or the EPA. (SALDO, Section 407(C)(5).)

review of the letters exchanged between the Township, the Township Engineer and Heritage *indicate that Heritage accepted the conditions set out by the Township.*

Further, the cases Morris cites to support her argument on this issue do not apply. All three cases indicate that a person seeking to subdivide property must provide proof of at least an equitable interest in the property prior to applying for an application to subdivide. Here, Heritage *has* equitable ownership of the property it seeks to subdivide. It does not wish to subdivide the property needed for the deceleration lane however; Heritage merely seeks an easement for a right-of-way. Therefore, contrary to Morris' understanding, the status of Heritage's ownership interest in the right-of-way property is entirely independent of the standing issue and the property it wishes to subdivide.

Third, Morris argues that the plan violates Sections 401–403 of the Zoning Ordinance because it permits commercial treatment of off-site sewage. The plan calls for off-site sewage to be pumped to the Symons Farm Tract development and disposed of on the designated open space land. Morris contends that using this area as, essentially, a commercial sewage site, is a non-permitted use in the AG zoning district. She cites to Sections 401–403 of the Zoning Ordinance, which describe permitted uses in this district by right, special

exception and conditional use approval, respectively.

■ Actually, Morris' statement that Heritage will be disposing of off-site sewage is a mischaracterization of the facts. The sewage from the new development will be *treated* at sewage facilities on the opposite side of Route 100, which are part of another development, called Ridglea. (*See* Proposed Agreement, Realen Homes, L.P. and Heritage Building Group, Inc., April 1, 2002, pp. 2–3, 6.) Once the sewage has been treated at Ridglea, a metered amount of wastewater will be returned to the Symons Farm Tract via drip irrigation. (*See* Community Facilities Analysis, revised June 19, 2001, p. 2; Memorandum to Mildred W. Donnell [Secretary–Treasurer of Board] from Castle Valley Consultants, Inc., Craig A. Kologie, AICP, April 2, 2002, p. 2.) This is a "land application of wastewater" and is a specifically permitted use within designated open spaces pursuant to Section 706(2)(D) of the Zoning Ordinance.[16]

Fourth, Morris argues that the waivers granted by the Board were illegal. She states that the Board granted two waivers from SALDO requirements to allow clearance of vegetation on steep slopes and to allow inadequately separated intersections to access Route 100.[17] Morris argues that this was done in error because Section 701(1) of the zoning ordinance, describing general regulations concerning the Open

---

**16.** Section 706(2) states that "[a]reas designated for open space purposes may be used for any of the following:.... D. Land application of wastewater including individual systems, where permitted in accordance with the South Coventry Township Sewage Facilities Plan, and where the Board of Supervisors is satisfied that adequate provision(s) for the long-term management and maintenance of the wastewater are guaranteed."

**17.** Section 618(C)(2)(b) of the SALDO states: "No earth-moving or stripping of vegetation

shall be conducted in areas of greater than 25% slope unless specific approval is obtained from the Board of Supervisors with recommendations from the Township Engineer." Section 607(D) of the SALDO states: "Wherever feasible, intersections along major streets shall be kept to a minimum, at least one thousand (1,000) feet apart, except in those cases deemed by the Board to require close spacing without endangering the safety of the public. Separation distances shall be· measured centerline to centerline."

Space Development Option, *precludes* any waivers from the requirements of the SALDO. This section states: "Applicant shall comply with *all applicable provisions* of the South Coventry Township Subdivision and Land Development Ordinance." (Emphasis added.) Thus, she argues that the developer must comply with *all* provisions of the SALDO, and that granting the waivers violates the purpose and intent of the Open Space Development Option.

 However, Morris has failed to cite any authority to support her claim that Section 701(1) of the Zoning Ordinance can operate to negate a specific provision of the SALDO or Article V of the MPC, 53 P.S. §§ 10501—10515.3.[18] In fact, contrary to Morris' contentions, Section 701(1) of the Township Zoning Ordinance does not require compliance with regulations in the SALDO. Those regulations, are expressly made waivable under the SALDO because they are no longer "applicable provisions" required by Section 701(1).

Section 503(8) of the MPC, 53 P.S. § 10503(8), expressly authorizes a municipality to enact provisions for administering waivers or modifications of literal compliance with the provisions of its SALDO.[19] Here, the Township implemented Section 900, entitled "Hardship," which states:

A. If any mandatory provisions of this ordinance are shown by the applicant, to the satisfaction of the Board, to be unreasonable and cause undue hardship as they apply to his proposed subdivision, the Board may grant a modification to such applicant from such mandatory provisions, so that substantial justice may be done and the public interest secured; provided that such modification will not have the effect of nullifying the intent and purpose of this ordinance.

B. In granting modifications, the Board may impose such conditions as will, in its judgment, secure substantially the objectives of the standards or requirements so modified.

And, whether or not a township uses that authorization, pursuant to Section 512.1(a) of the MPC, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10512.1(a), the *Board itself* has complete authority to grant waivers "if the literal enforcement will exact undue hardship because of peculiar conditions pertaining to the land in question, provided that such modification will not be contrary to the public interest and that the purpose and intent of the ordinance is observed." 53 P.S. § 10512.1(a).

Heritage requested a waiver from Section 618(C)(2)(b) of the SALDO because "[i]t appears that areas with 25% slope or greater will be disturbed as a result of this project." (Heritage Response Letter to Engineering Report, October 1, 2001, no. 35.) Heritage also requested a waiver from Section 607(D) because "[t]he separation between the secondary commercial entrance road and "Road A" appears to be less than 300 feet." *Id.*, no. 28. These

18. We note initially that, in the MPC, subdivision and land development is treated as a distinct and separate subject from zoning; Article V of the MPC, 53 P.S. §§ 10501—10515.3, covers "Subdivision and Land Development," and Article VI of the MPC, 53 P.S. §§ 10601—10619.1, covers "Zoning."

19. Section 503(8) of the MPC states that "[t]he subdivision and land development ordinance may include, but need not be limited to: ... (8) Provisions for administering waivers or modifications to the minimum standards of the ordinance in accordance with section 512.1, when the literal compliance with mandatory provisions is shown to the satisfaction of the governing body or planning agency, where applicable, to be unreasonable, to cause undue hardship, or when an alternative standard can be demonstrated to provide equal or better results."

requests for waivers had the full support of the Township Engineer. (*See* Township Approval Letter, April 17, 2003, Exhibit A, nos. 5 and 7.) Pursuant to its authority under Section 900 of the SALDO and Section 512.1(a) of the MPC, the Board granted these waivers conditioned upon satisfactory compliance with all **other** conditions for approval of the plan. *See id.* (specifically p. 3, no. 9). The Board made it clear that final approval of the waivers was reserved until "final plan approval following compliance with all such conditions." *Id.* We find no indication in the record that the modifications, as requested, are in any way contrary to public interest or are in conflict with the purpose and intent of the Zoning Ordinance.

Fifth, Morris argues that approval of the preliminary plan violates the SALDO because the plan includes a cul-de-sac street in excess of 1,000 feet. Morris claims that there is no functional basis for distinguishing this street from a cul-de-sac as the Board did. She argues that the road in question *is* a cul-de-sac, defined as "[a] local street intersecting another street at one end, and terminating at the other end by a permanent vehicular turnaround." [20] However, Morris concedes that even if the street is viewed as a single access street as it was by the Township solicitor, a cul-de-sac is *included within the definition* of a single access street in the SALDO.[21] Further, pursuant to SALDO, Section 603(A), a cul-de-sac designed as a permanent street may not exceed a maximum of 1,000 feet in length.

It is well-settled that the interpretation and application of ordinance terms are within the sole discretion of the Board and will not be disturbed absent a demonstration that an abuse of discretion or an error of law was committed. *Baker v. Chartiers Township Zoning Hearing Board,* 677 A.2d 1274 (Pa.Cmwlth.1996), *petition for allowance of appeal denied,* 547 Pa. 738, 690 A.2d 238 (1997). The Board relied on its own review of the application, and also on the opinion of the Township solicitor, for guidance regarding cul-de-sac and single access streets as applied to the Symons Farm Tract development's internal road configuration.

Furthermore, the fact that the municipality created a separate definition for a cul-de-sac street in the SALDO is indicative of its intent that it be treated differently from a single access street. Section 603(A) of the SALDO provides stringent dimensional requirements directed specifically to cul-de-sacs;[22] other types of streets have no such dimensional requirements. Further, the particular street in question is not set up as a "permanent vehicular turnaround"; rather, it is an independent roadway. A "turnaround" is defined as "a space permitting the turning around of a vehicle." Merriam–Webster's Collegiate Dictionary 1270 (10th ed.2001). Neither of the streets proposed in the preliminary plan contains a segment for

---

**20.** SALDO, Section 201, p. 13, no. 2.

**21.** SALDO, Section 201, p. 13, no. 7, defines "Single–Access Street" as "[a] local street or streets, including but not limited to, cul-de-sac and loop designs, which has only one (1) point of intersection with an existing Township or State road or with a proposed road having more than one (1) access point."

**22.** SALDO, Section 603(A) states: "Cul-de-sacs designed as permanent streets shall not exceed one thousand (1,000) feet in length measured to the edge of the paving of the cul-de-sac, and shall be provided at the closed end with a paved turnaround having a minimum diameter to the outer pavement edge of one hundred (100) feet. Right of way shall have a minimum diameter of one hundred twenty (120) feet within the turnaround."

which the definition of "turnaround" would apply.

Sixth, Morris claims that the Board abused its discretion by approving a plan that will adversely impact the water quality of the French Creek, an exceptional value stream expressly designated pursuant to what is colloquially known as the Pennsylvania Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.1001. She argues that the plan, as presented, fails to protect the environment and that the Board failed to prevent adverse impacts on natural resources.

Morris notes, in her brief, that a hydrogeologist[23] testified before the Board twice and submitted a written report, but the Board did not make any findings, nor did it reject any of the hydrogeologist's testimony or evidence. (Appellant's Brief at p. 27.) (*See also* Minutes, South Coventry Township Board of Supervisors Meeting, March 4, 2002, p. 2.) However, Morris notes that the hydrogeologist testified that the planned development would harm the environment due to the "steep slope, intrusion into exceptional value wetlands, sedimentation, ecological impacts, removal of prime farmland, the removal of trees, ground water impacts, traffic impacts, noise dust and testing done for drip irrigation." (Minutes, South Coventry Township Board of Supervisors Meeting, March 4, 2002, p. 2.) Morris argues that the

Board has a duty to oppose, actively, schemes of development unreasonably proposed and conceived. *Raum v. Board of Supervisors of Tredyffrin Township,* 29 Pa.Cmwlth. 9, 370 A.2d 777 (1976). Further, she argues that Section 604 of the MPC states that local zoning ordinances must be designed to promote and facilitate the "preservation of the natural, scenic and historic values in the environment and preservation of forests, wetlands, aquifers and flood plains." 53 P.S. § 10604. Also, she avers that the Township has a duty, pursuant to Article I, Section 27 of the Pennsylvania Constitution,[24] to protect the environment and act as trustee of the environment for the benefit of all people.

 Contrary to Morris' averments, the record clearly indicates that the Township has made every attempt to insure that environmental statutes and regulations administered by others are followed. Heritage has submitted applications to each of the appropriate state and/or federal agencies for permits and is currently in the application and approval process. The review and approval process ensures that French Creek will be protected in accordance with the law. If any part of Heritage's plan is in violation of state or federal law, such state or federal agencies will refuse to issue permits. This comports with the requirements of Section 407(C)(5) of the SALDO.[25]

---

**23.** Morris' Brief, at page 27, identifies Dr. Ellie Triegel as a hydrogeologist; however, we cannot find any authority supporting this individual's profession in the record.

**24.** Article I, Section 27 states: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall

conserve and maintain them for the benefit of all the people."

**25.** Section 407(C) states that every *final* plan is subject to the following conditions: ... "5. The submission to the Township of all required permits from agencies having jurisdiction over ancillary matters necessary to effect the subdivision or land development, such as Pennsylvania Departments of Transportation and Environmental Resources, Public Utility Commission and Chester County Health Department."

Moreover, Morris cites *Raum* out of context, and misrepresents the Court's reasoning. The Court actually said, "Clearly, [the Board's] duty is to actively oppose schemes of development unreasonably proposed and conceived, *but likewise, their duty is to sanction well planned development.*" *Raum,* 370 A.2d at 781 (emphasis added). Morris also fails to cite to any specific zoning or SALDO sections which will allegedly be violated given approval of this plan. She does cite to the Clean Streams Law, but it is actually the Department of Environmental Protection that exercises control and responsibility over the protection of French Creek. And, although Morris cites to the Pennsylvania Constitution, that document cannot empower or require an agency to exceed the bounds of its legislative duties and powers. *See Commonwealth of Pennsylvania Game Commission v. Commonwealth Department of Environmental Resources,* 97 Pa.Cmwlth. 78, 509 A.2d 877 (1986), *affirmed,* 521 Pa. 121, 555 A.2d 812 (1989); *Borough of Moosic v. Pennsylvania Public Utility Commission,* 59 Pa. Cmwlth. 338, 429 A.2d 1237 (1981). The Township is without power to deny subdivision approval based upon generalized concerns over environmental impact, and under the enabling statute which allows it to regulate subdivision, Section 508(2) of the MPC, 53 P.S. § 10508(2), it has no power to do so.

Finally, Morris' seventh argument is that plan approval without evidence of sewage service violates the Zoning Ordinance and the SALDO. She notes that Sections 701(3) of the Zoning Ordinance and 619(H) of the SALDO *require* develop-

ments to be served by sewage disposal systems.[26] She also notes that Heritage failed to provide information, as required under SALDO Section 501(B)(23), which outlines materials that "shall be submitted for consideration as the preliminary plan for subdivision or land development":

Where off-site sewer service is proposed, the preliminary design of sewage systems including, but not limited to, the location and grade of sewers, pumping stations, force mains, and where applicable, sewage treatment facilities, showing the type and degree of treatment intended and the size, capacity, and location of treatment facilities.

■■■ Nothing in the Township's Zoning Ordinance or SALDO requires that *final* planning details and permits be in place at the time of approval of the *preliminary* plan. We agree with the Board's conclusion that Heritage complied with the sewage disposal system information requirements needed for preliminary plan approval. (*See, e.g.,* Subdivision and Land Development Community Facilities Analysis, revised June 19, 2001; Proposed Agreement, Realen Homes, L.P. and Heritage Building Group, Inc.; Permit Application, Department of Environmental Protection, submitted January 28, 2002; Minutes, South Coventry Township Planning Commission Meetings, Environmental Advisory Council Meetings, 2001–2002.) For example, Heritage's proposed agreement with Realen Homes, L.P., to connect the Symons Farm Tract development to the community sewage disposal system proposed for public dedication on the nearby Ridglea development, provides

---

**26.** Section 701(3) of the Zoning Ordinance states in pertinent part: "Development under ... the ... Open Space Development Option[] shall be served by individual or public sewage disposal systems consistent with the South Coventry Township Sewage Facilities (Act 537) Plan...." SALDO Section 619(H)(1) states: "Sanitary sewage disposal systems shall be provided consistent with the design standards and requirements contained in this Ordinance."

preliminary information concerning the sewage system's capacity, and the potential need for development of additional necessary storage lagoons, drip irrigation areas and storage facilities. The proposed agreement even states that "Heritage acknowledges that Castle Valley Consultants [Craig A. Kologie, AICP, Township Engineer] has advised Realen that minor modifications to the wastewater treatment plant will be required" to accommodate the Heritage project, and that "the exact nature of those modifications is undetermined" at this time. Thus, the preliminary plan submitted by Heritage furnishes evidence of a feasible connection to an existing community sewage system, which we hold is sufficient to support the Board's preliminary approval of its plan with conditions.

Further, courts have long held that, where an outside agency's approval is required, the municipality should condition final approval upon obtaining a permit, rather than denying preliminary approval of the land development application. *Stein v. Easttown Township Board of Supervisors,* 110 Pa.Cmwlth. 293, 532 A.2d 906 (1987). That is, in fact, exactly what occurred in the case *sub judice.* In its approval letter, the Board explicitly stated that: (1) "[a]ll comments of the Township Engineer set forth in its letter of April 2, 2002 ... shall be addressed and *remain subject to the Township's approval as part of the final plan submission* "; and (2) "preliminary subdivision plan approval is conditioned on receipt *by the time for final approval* of any and all necessary governmental permits and approvals from other governmental agencies, including but not limited to, all those listed in the Township Engineer's letter appended as Exhibit 'A'." (Township Approval Letter, April 17, 2003, p. 2–3, nos. 1 and 8)(emphasis added). The Township Engineer's Letter (Exhibit 'A' to the Township Approval Letter, April

17, 2002) stated that "[t]he *detailed design* of the wastewater storage and disposal system must be reviewed and approved by the Township *prior to final plan approval.*" (Township Engineer Letter, April 2, 2002, p. 5, no. 10)(emphasis added).

Accordingly, based on the analysis in this opinion, we affirm the order of the trial court.

### ORDER

**NOW,** October 24, 2003, the order of the Court of Common Pleas of Chester County in the above-captioned matter is hereby affirmed.