Laura B. KOHR and Leon
P. Haller, Esq.

v.

LOWER WINDSOR TOWNSHIP
BOARD OF SUPERVISORS,
Appellant (Six Cases).

Laura B. Kohr and Leon P.
Haller, Esq., Appellants

v.

Lower Windsor Township Board
of Supervisors.

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2006.
Decided Nov. 3, 2006.

Charles M. Suhr, Harrisburg, for appellant, Lower Windsor Township Board of Supervisors.

John C. Snyder and Joseph T. Doyle, Wayne, for appellees, Laura B. Kohr and Leon P. Haller, Esq.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are appeals by the Lower Windsor Township (Township) Board of Supervisors (Board) from orders of the Court of Common Pleas of York County (trial court) dated September 2, 2005, reversing its decision to deny the preliminary subdivision plans filed by the Estate of Ronald C. Kohr (Landowner) and dated September 16, 2005, denying its motion for reconsideration. Landowner also filed a cautionary cross-appeal from that portion of the trial court's order denying its petition for a hearing to present additional evidence on the Township's alleged bad faith.

Landowner owns approximately 900 acres of land known as Lauxmont Farms located along the western shore of the Susquehanna River in Lower Windsor Township, York County, Pennsylvania. It sought to develop approximately 230 contiguous acres of its property involving three separate subdivision plans. Initially, Landowner filed two preliminary subdivision plans with the Township for development of portions of the property denominated as Lakeside East and Lakeside West. Lakeside East consisted of 187 acres to be subdivided into 110 single-family residence lots and one large lot (Lot 116) for multi-family dwellings. Lakeside West consisted of 145 acres to be subdivided into 143 single-family residence lots. Landowner later submitted a third preliminary subdivision plan for 326 multi-family townhouse dwelling units to be developed on Lot 116 referred to as Lakeside East Townhouses.

In accordance with Section 402bb of the Lower Windsor Township Subdivision and Land Development Ordinance (Subdivision Ordinance),[1] Landowner's initial Act 537[2] planning module contained a sewer and

1. Section 402bb of the Subdivision Ordinance provided that the subdivision application was to be accompanied by a:
    Feasibility Study on sewer and water facilities for the tract (s. 403) and for land developments of two or more lots or dwelling unit, a Plan Revision Module for Land Development along with the recommendations from the local office of the Pennsylvania Department of Environmental Resources.

2. Sewage Facilities Plan (often referred to as an Act 537 Plan) pursuant to the Pennsylvania Sewage Facilities Act, Act of January 24,

water feasibility report discussing four options it considered for sewage disposal, including 1) connection to the existing system in East Prospect Borough; 2) connection to the existing system in Wrightsville; 3) the use of an on-lot septic system; and 4) the construction of a community-owned sewer treatment plant. Landowner proposed to use the fourth option that "[t]he site shall be serviced by public water to be supplied by York Water Company and by public sewer, to be owned and operated by the Home Owners Association (HOA)." (Board's Brief, Exhibit A at 8.)

The Township Engineer did not object to Landowner's selection but noted, among other things, that in order to conduct an adequate review, it needed details of a proposed sewage management program. In its January 9, 2003 revised Act 537

planning module, Landowner provided the details of a sewage management program indicating "[a] maintenance agreement between the Sewer Association and a firm experienced in the operation and maintenance of sewage treatment systems [would] be executed" to satisfy 25 Pa.Code § 71.72.[3] (Reproduced Record at 70a.) The revised planning module also included a joint venture agreement with the HOA to own and operate the system. The Township Engineer responded that while the new facility may be the best option, it was not supported by the feasibility study. He also indicated that Landowner had not discussed all the options for sewage disposal,[4] and that the Board might not be willing to accept its proposal.

On March 19, 2003, Landowner submitted a third revision to its Act 537 planning

---

1966, P.L. (1965) 1535, *as amended,* 35 P.S. 750.1–750.20a (often referred to as Act 537).

**3.** 25 Pa.Code § 71.72 provides, in pertinent part:

(a) When an official plan or revision to an official plan for existing needs areas or new land development proposes the construction of Department permitted non-municipal sewage facilities, or a community onlot sewage system permitted by a local agency . . . the official plan or revision shall evaluate the options available to assure the long-term proper operation and maintenance of the proposed sewage facilities. The municipality, prior to adoption of that official plan or revision, shall require one or more of the following:

(1) A bond or escrow account sufficient to cover the costs or future operation and maintenance of the sewage facilities under local ordinance. Bonding, escrow or other security shall be forfeited to the municipality upon notice by the Department of continuing noncompliance of the system with the operation and maintenance standards established through a condition in the permit issued by the Department or local agency. . . .

(2) A maintenance agreement between the property owner and an individual, firm

or corporation experienced in the operation and maintenance of sewage treatment systems.

(3) A maintenance agreement between the property owner and municipality or its designated local agency which establishes the property owner's responsibility for operating and maintaining the system and the responsibility of the municipality or local agency for oversight of the system.

(4) A municipal ordinance which requires the system to be operated and maintained through a maintenance agreement between the property owner and an individual, firm or corporation experienced in the operation and maintenance of sewage treatment systems.

(5) Establishment of a properly chartered association, trust or other private legal entity to assure long-term administration of an operation and maintenance program.

**4.** Landowner's Act 537 planning module evaluated four potential alternative sewage disposal options, which included: 1) connection to a nearby public sewer; 2) construction of a new treatment facility with stream discharge; 3) construction of a new treatment facility with spray irrigation disposal; and 4) construction of a new treatment facility with drip irrigation disposal.

module which included a list of sewage management options: 1) public (non-municipal) treatment system, 2) municipal treatment system, and 3) community type public sewer system. The Township Engineer noted that Landowner's listing without a specific proposal did not comply with the Subdivision Ordinance. Landowner then submitted a fourth revision, again with no sewage management option selected.

In a letter dated April 7, 2003, Landowner's Engineer requested that the Township take a concrete position regarding management of the system because under 25 Pa.Code § 71.72, it had oversight over the proposed facilities. Until the Township took a position, he indicated that the "the modules will continue to show non-municipal facility owned, operated, and permitted by a public utility company under the jurisdiction of the Public Utility Commission, or by a duly formed private Sewer Association." (Board's Brief, Exhibit A at 12.) The Board responded that the Township had no municipal role in community wastewater facilities and "[w]hile modules continue to refer to a non-municipal facility owned, operated, and permitted by Public Utility Co. under the jurisdiction of the Public Utility Commission, plans continue to refer to a private sewer association, to which the Town-

ship objects." (Reproduced Record at 55a.)

By letter dated May 5, 2003, Landowner explained that it secured letters of intent from public utilities willing to own and operate the facility, but the Board claimed that these were insufficient and required a final agreement to be in place before it would consider the option. Landowner followed up on May 7, 2003, with a Wastewater Treatment Agreement [5] with Suburban Wastewater Company (Suburban) to provide public utility sewer service and requested the Board to condition its subdivision action on the requisite sewer approvals and permits. Landowner also offered the Board additional time in order to adequately examine the proposal.

By letter dated May 14, 2003, the Board notified Landowner that it had rejected all three of its preliminary subdivision plans. Among other reasons, the Board denied the request because:

- The Act 537 planning modules did not contain a recommendation from the local office of Department of Environmental Protection as required by Section 402bb of the Subdivision Ordinance.
- The feasibility study did not satisfy the requirements of Section 403 of the Subdivision Ordinance [6] because it was superficial, incomplete and contained in-

---

5. Reproduced Record at 112a–127a.

6. Section 403 of the Subdivision Ordinance provides:

The developer shall submit a Feasibility Report in duplicate concerning the availability of sewer water facilities in or near a proposed land development. Said report shall be prepared by a Registered Professional Engineer if requested by the Township and be submitted in conjunction with the Preliminary Plan for review and recommendations by the local office of the Pennsylvania Department of Environmental Resources. The Feasibility Report shall consist of an examination of possible connection to an existing sewerage system and water supply system. The study shall include the distance from the nearest public sewer and public water and the capacity of the existing system to accommodate the proposed land development.

If the above method of sewerage disposal is found to be feasible, formal application shall be made to the Commonwealth of Pennsylvania, Department of Environmental Resources and a permit obtained from the Bureau of Water Quality Management prior to the construction of sewers or treatment facilities.

sufficient cost or other figures to support its conclusions. Also, there was no indication that a public sewer or connection to a public sewer was not feasible.

• The Act 537 planning modules did not comply with Section 402j of the Subdivision Ordinance that required the type of system to be shown because the plan appeared to provide both a public and private system.

• The only plan submission prior to the Board of Supervisors' meeting at which action had to be taken provided for a private system to be operated by a joint venture, not a public utility.

• The proposed agreement with Suburban was insufficient because it was only an "agreement to agree" and the proposed public utility had not been approved by the Pennsylvania Public Utility Commission.

• It was unreasonable for Landowner to consider the Suburban plan as the Wastewater Agreement because it was only submitted at the meeting where the Board was required to act.

Landowner then filed three separate appeals with the trial court as well as a separate petition for a hearing to present additional evidence on the Township's alleged bad faith. Following oral argument on whether to grant Landowner's petition, both parties complied with the trial court's order to cite to the portion of the record that pertained to the rejection of the preliminary subdivision plans by submitting a brief and supplementing the record.[7]

Without further briefs or arguments and making its own findings, the trial court, by three separate orders dated September 2, 2005, reversed the Board's decision, finding, in pertinent part:

• That it was immaterial whether a recommendation was given by DEP because the Township should have granted preliminary subdivision approval conditioned upon DEP approval of the Act 537 Planning Module.

• While the initial feasibility study was insufficient, it underwent significant revisions throughout the review process that its final form provided sufficient detail as to the alternatives and cost to comply with Section 403 of the Subdivision Ordinance.

• "The Township, by their refusal to give specific guidance to the [Landowner] in response to numerous requests to do so, played a significant role in the

7. Landowner contended that it "has witnesses who will testify that the Township admitted that it withheld review comments to intentionally conceal its proposed grounds for denial and that it sought to increase costs and cause delays in an effort to gain 'leverage' on the applicant." (Original Record, Brief in Support of Petition for Hearing Before the Court of Common Pleas at 18.) Landowner also supplemented the record with a summary of the documents it relied upon to satisfy the requirements of Section 403 and 510 of the Subdivision Ordinance.

The Township contended that Landowner knew their development was within 1,000 feet of Hedgewick Lane, an existing public sewer located in East Prospect Borough, not in the Township. It argues that Landowner's Engineer even concluded that such a connection was at least "remotely feasible," but Landowner still never requested a waiver of Section 510a of the Subdivision Ordinance with information showing that "remotely feasible" was "not possible."

In response to the Township's supplemental brief, Landowner contended that waiver was not required to exempt them from connecting to a sewer system which was impossible to connect to; was not owned or controlled by the Township; was too small to provide service; that consistently declined service for the new developments; and Landowner had no right to use that sewer. Landowner argued that the Township insisted they request a waiver from making an impossible connection without ever informing them, in good faith, that the Township deemed such a waiver to be necessary.

failure of the [Landowner] to choose a specific option."

• The Board incorrectly characterized the system as a private system because it was public whether operated by a homeowners association or a public utility system as either system proposed was to provide sanitary sewers to all residents of the development.

It went on to hold in its 1925(b) opinion that the Township's processing of the application was in bad faith because it "insinuated itself in the decision-making process by categorically opposing the [Landowner's] original plan of ownership and operation of the public sewer system by the Homeowners Association. Once the Township indicated a willingness to oppose a specific choice of sewer system, it obligated itself to engage in a dialogue with the Landowner over which options they would not oppose."

The Township then filed three motions for reconsideration of the three September 2, 2005 orders, contending, among other things, that 1) it did not file an "answer" to the notice of appeal and, therefore, no Board filings countering the allegations were before the trial court; 2) it was denied the opportunity to present its position on complex land development issues; 3) it was denied due process because the trial court did not receive briefing and argu-

ment; and 4) it was denied due process and the trial court abused its discretion by finding that the Board acted in bad faith without giving it an opportunity to be heard. By three orders dated September 16, 2005, the trial court denied the applications stating that it had a full record before it and did not need to take additional evidence to decide the matter. The Board then filed three appeals from the September 2, 2005 orders and three appeals from the September 16, 2005 orders, and Landowner filed a cross-appeal from the denial of their petition to present additional evidence. All seven appeals were consolidated for review by this Court.[8]

■ Initially, the Township, without citing any authority, contends that the trial court denied it due process in deciding the merits and finding that it acted in bad faith without receiving briefs or allowing argument.[9] Like the Township, we are unable to find any decision that imposes a duty on a court to allow a party to brief and/or argue a case before reaching a decision on an appeal. We need not reach that issue because the information the parties submitted to the trial court eliminated any due process argument. First, the parties submitted briefs and supplemental evidence to the trial court addressing their respective positions when the trial court addressed Landowner's request to submit

---

8. In a case where the trial court takes additional evidence or takes no additional evidence, but makes it own findings based on the record, we must examine the *trial court's* decision, not the Board's, for evidentiary support. *Koutrakos v. Zoning Hearing Board of Newtown Township*, 685 A.2d 639 (Pa. Cmwlth.1996) (trial court is the fact-finder when the board has not made findings). Accordingly, the scope of our review in the case now before us is whether the trial court committed an abuse of discretion or an error of law. *Faulkner v. Board of Adjustment of Moosic Borough*, 154 Pa.Cmwlth. 616, 624 A.2d 677 (1993).

9. In its cautionary cross-appeal, Landowner contends that the trial court abused its discretion when it denied Landowner's motion to present additional testimony and evidence that would establish conclusively that the Board acted in bad faith when denying its application. Because Landowners were not aggrieved by the September 2, 2005 orders, they cannot appeal. *See Pittsburgh Construction Company v. Griffith*, 834 A.2d 572 (Pa.Super.2003) (only aggrieved party may appeal).

additional evidence on the issue of whether its application was denied in bad faith. (See footnote 8, *infra.*) After resolving that issue, the trial court then directed the Township [and Landowner] to submit "direct citations, correspondence, review letters, proposals, plans, etc., of the present record (with specific reference therein to any relevant language diagrams, distance measurements, etc. and with designation of author and date) which the Board considered and relied upon in denying Plaintiffs preliminary Subdivision and Land Development Plan." Finally, the Township's reasons, i.e., its legal rationale, were set forth in the Board's decision denying the subdivisions. Because all of that provided the parties sufficient opportunity to set forth their respective positions on the merits to the trial court, any possible claim of a lack of due process because the Township was not permitted to file briefs or have argument has not been made out.

Now to the substance of the appeal—whether the trial court properly reversed the Board's decision to deny the requested subdivisions based on Landowner's sewage disposal plans. At the core of the Township's argument is that Landowner failed to justify the proposed subdivision lot sizes as it did not establish that the subdivision would be served by a "public sewer system" because one of Landowner's options, a sewage treatment plant operated by a homeowner's association, is not a "public sewer" as that term is used within the context of the Subdivision Ordinance. While that position has some merit, when the matter came up for vote, Landowner was no longer proposing that a homeowner's association operate the plant or any other option; it was proposing that a public utility company be formed as a subsidiary to Suburban to operate the plant.

■ Even though Landowner first proposed having a public utility company operate this sewage facility in March 2003, the Township contends that it rightfully denied the application because the Wastewater Treatment Agreement (Agreement) the parties would enter into was not submitted until the night of the meeting where the vote was to be taken. If the Township believed that it needed additional time to review the Agreement, it should have adjourned the meeting to a later date, as agreed to by Landowner, to address whether the Agreement was sufficient, and not to do so was an abuse of discretion.

Even if the Agreement had been considered, the Township contends that the Wastewater Treatment Agreement between Landowner and Suburban was insufficient to establish compliance with the Subdivision Ordinance because it was an "agreement to agree," the financial details were not worked out,[10] and Suburban did not have the necessary certificates from the Pennsylvania Public Utility Commission. The Township further argues that the Agreement marked as Exhibit A and attached to the Wastewater Treatment Agreement, which was to replace the Wastewater Treatment Agreement, was not signed. It argues that these were fundamental defects making conditional approval inappropriate.

■ What this argument ignores is that the sewer planning process is a separate process from the subdivision approval

---

10. As the party seeking approval, the landowner has the burden of proving that it meets the objective requirements of a subdivision and land development ordinance. *Ball v. Montgomery Township Board of Supervisors,* 143 Pa.Cmwlth. 142, 598 A.2d 633 (1991). If a landowner does not satisfy these requirements, then the Board will disapprove the plans and cite to the specific provisions of the ordinance that were not satisfied pursuant to Section 508(2) of the MPC, 53 P.S. § 10508(2).

process and is governed by the Pennsylvania Sewage Facilities Act. There is no requirement that the sewer planning process be completed prior to the granting of preliminary subdivision plan approval, only that the process be commenced. It is "more reasonable and consistent to condition final approval of the development plan upon obtaining all the required permits from the DEP, rather than rejecting the [preliminary] plan outright." *CACO Three, Inc. v. Board of Supervisors of Huntington Township,* 845 A.2d 991, 996–97 (Pa.Cmwlth.2004). In this case, even though Landowner only had an "agreement to agree" with Suburban to organize a public utility to operate a sewage facility plant to serve the proposed land development,[11] the Township should have approved the preliminary plan conditioned on Landowner and Suburban obtaining all the necessary permits from DEP and the Pennsylvania Public Utility Commission for final plan approval.

Even if the Wastewater Treatment Agreement was sufficient, the Township contends that it could not have approved the waste disposal plan conditionally because Sections 403 and 510a [12] of the Subdivision Ordinance require a landowner to connect to a public sewer if located within 1,000 feet of the proposed development. Because two public sewers were within 1,000 feet, absent a request for waiver by Landowner, the Township argues that it had no obligation to approve the preliminary plan. The Township's argument fails for several reasons.

First, Landowner did, in effect, request a waiver because when it submitted to the Board an option to build a new plant operated by Suburban, the only way that such a request could have been granted was if the Board found that connection to existing public sewers within 1,000 feet of the new plant was not feasible. Second, the trial court properly found that the Township, after receiving a proposal for the construction of a new plant, had an obligation to inform Landowner that it also had to request a waiver, stating:

> [I]t is an error of law for the Township to assert the failure of [Landowner] to request a waiver of section 510a of the

---

11. With respect to the financial details, the Wastewater Agreement provided:

> 3. The parties shall, based upon the design of the system, determine a reasonable sewer fee to propose to the PA PUC for users of the system, which proposed fee is not expected to be less than $600/yr, consistent with fees charged by public utilities, municipal authorities and municipalities in the general areas of Lower Windsor Township that were reviewed by the parties, and based thereupon, determine the amount of reasonable acquisition consideration to be paid by SWW to Owner as units are connected. SWW will also determine, based upon the design of the plant and facility, the amount of the initial operations and maintenance subsidy due from Owner to SWW at the initial start-up of the system.
> 4. Based upon the financial calculations to be reached pursuant to Paragraph 3 above, the parties agree to insert the necessary numerical information in the proposed

agreement attached hereto as Exhibit "A" and to, promptly thereupon, execute the attached agreement as the successor agreement to this Agreement. Thereupon, this Agreement shall terminate and the relationship of the parties shall be governed by the executed and finalized version of the agreement attached hereto as Exhibit "A" and executed by the parties.

(Reproduced Record at 113a.)

12. Section 510a of the Subdivision Ordinance provides:

> Based upon the results of the feasibility report required in s.430 the development must be provided with sanitary sewage disposal facilities as follows:
> a) Where there is an existing public sanitary sewer system on or within 1,000 feet of the proposed development a complete sanitary sewage collection system must be installed and connected to the existing public sanitary sewer system, or . . .

Ordinance when the Township interpreted the Ordinance in such a manner that they felt that such a waiver would be granted, and, once granted would cure the defect with the plans, and that the Township never explained this interpretation to [Landowner], as justification for a denial of the subdivision plans. Further, the Court finds that the Township acted in bad faith by failing to discuss with [Landowner] their interpretation of section 510a of the Ordinance to mean that the request of a waiver would have been granted and would have successfully dispensed with any requirement to connect to the existing public sanitary sewer system.[13]

(Trial court's opinion at 34–35.)

The Township then argues that "waiver" was inappropriate because Landowner's Sewer Feasibility Study did not demonstrate that connection to an existing public sewer system was not feasible because it stated that connection to the East Prospect Borough Sewer System was "remotely feasible," and until the Landowner conducted an in-depth cost analysis to determine feasibility, the granting of a waiver was inappropriate.[14] Taken as a whole, the Sewer Feasibility Study demonstrated that a waiver should have been granted from the 1,000 feet connection requirement because that system lacked capacity to serve the subdivisions, other subdivisions would have to be included in building new capacity, and an addition to the plant may have been impractical for engineering reasons. Because Landowner's Sewer Feasibility Study[15] supported that it was unlikely a connection could be made to a public

---

13. In *Raum v. Board of Supervisors of Tredyffrin Township*, 29 Pa.Cmwlth. 9, 370 A.2d 777, 798 (1977), we stated that a "[a] municipality has a legal obligation to proceed in good faith in reviewing and processing development plans. The duty of good faith includes discussing matters involving technical requirements or ordinance interpretation with an applicant, and providing an applicant a reasonable opportunity to respond to objections or to modify plans where there has been a misunderstanding or difference of opinion."

14. Paragraph two of the Board's May 14, 2003 denial letters provides:

Section 402bb of the Ordinance also requires a feasibility study on water and sewer facilities in accordance with the provisions of Section 403. The requirements of Section 403 are not met by the study submitted as it is superficial and incomplete and contains insufficient costs or other figures to support its conclusions. There is no indication in the study that a *public* sewer system is not feasible or that connection to the existing public sewer system is not feasible.

(Board's brief at Exhibit D–F.)

15. The Act 537 planning module revision dated March 19, 2003, provided the following Feasibility Report, in pertinent part:

*East Prospect Borough*
The municipal boundary for East Prospect Borough is only 500 feet away. However, according to a water and sewer feasibility report prepared by Light–Heigel and Associates, Inc. for the nearby Lauxmont Farm Subdivision (Section VI), it is evident that the Borough does not have the capacity to accept flows from these developments. This conclusion is further supported from a verbal response received from East Prospect Borough's Engineer on question raised in a letter dated February 12, 2003 from American Water Services.... In summary, the verbal response highlighted the following (request for a written follow-up was made, but it was not provided):
● The Borough does not have the capacity for these projects, either individually or combined. The plan is permitted for 60,000 gpd and is at approximately 80% (48,000 gpd) capacity. Capacity could only be provided with a significant plant expansion and possibly collection/conveyance system upgrades.
● There have been a number (4 to 6) of other developers who have approached the Borough with similar interests, with estimated sewer needs of approximately 250,000 gpd (in addition to the 141,720 gpd needed for the Lakeside Developments). Any plan expansion to accom-

sewer system located within 1,000 feet of the subdivisions, the trial court did not abuse its discretion in finding that a waiver from that requirement was appropriate.

Accordingly, for the foregoing reasons, the orders of the trial court dated September 2, 2005, are affirmed.[16]

modate the Lakeside Developments would have to incorporate these other potential developments. Thus the plant [sic] expansion could be 4 to 6 times it [sic] current size. Act 537 Planning (coordinated via amendment of Lower Windsor Township's Act 537 Plan) would have to be done and funding secured to construct the expansion and other improvements.

• There is room surrounding the plant to handle an expansion, but the construction would be expensive due to the known presence of rock.

The cost impact of such project cannot be estimated without significant engineering studies, PADEP input and Township and Borough Agreements to undertake the necessary work. Given the other alternatives available for public sewer, this option is determined to be remotely feasible, but is not recommended.

*Wrightsville Borough Municipal Authority*

The Wrightsville Borough Municipal Authority has a system with some available capacity. An extension of their system is being terminated at the intersection of Long Level Road (SR 0624) and Hilts Road, a relatively long distance (1½ mi +/−) and much higher elevation than the developments. Administratively, the connection requires inter-municipal agreements, significant off-site roadway impacts and comparable costs to other alternatives. Connection to the Borough's system was investigated via letter dated February 12, 2003 from American Water Services with a written response from the Borough dated February 21, 2003. . . . In summary, the response highlighted the following:

• To handle the 140,660 gpd flow from the developments, the plant would have to be expanded (note the original request and response was for 175,000 gpd, which included anticipated flows from other nearby tracts as discussed later in this report). The expansion would be for both average daily flow requirements and to handle the peak flows, since flows would be pumped to the plant from Lakeside.

• The cost impact of such a project cannot be estimated without significant engi-neering studies, PADEP input, and Township and Borough Agreements to undertake the necessary work.

• The plant is at 55% of its capacity or average flows of 220,000 gpd. The Authority has commitments (although not defined in the response) to other entities, and therefore the full 180,000 gpd of remaining capacity is not available. It is possible that portions of the flows from one or two developments could be sent to Wrightsville Borough's facility, but from a sewage planning perspective (considering the close proximity of the Developments, potential for other nearby developments, and single land owners), it is not recommended to take a "split flow" approach.

The order of magnitude estimated is as follows:

| | |
|---|---|
| Pump station | $ 250,000 |
| Off-site Force main (14,000 1f at $75 1f) | $ 1,050,000 |
| Engineering, Legal, Admin | $ 200,000 |
| Tapping Fees ($2,700/Unit) | $ 1,576,800 |
| Inspection Fees ($25/Unit) | $ 14,600 |
| Total | $ 3,091,400 |
| Cost per unit | $ 5,300 |

The above cost does not include contributions for capital costs associated with the plant expansion, collection system improvements, or Route 624 pump station (Greystone Construction Project). This can easily exceed $1,000,000 ($1,725/home) if $10 per gallon of expanded capacity is used and 100,000 gpd expansion. The cost of the individual collection system (mains, conveyance pump stations and force mains) are common to any alternative so the costs remain constant and left out of the alternatives analysis for economic comparison purposes.

(Reproduced Record at 74a–76a.)

16. Additionally, the Township's appeals of the trial court's September 16, 2005 orders denying reconsideration of its September 2, 2005, final orders are not reviewable on appeal. *See Thorn v. Newman*, 113 Pa.Cmwlth. 642, 538 A.2d 105 (1988) (trial court's denial of request for reconsideration of final order not reviewable on appeal).

## ORDER

AND NOW, this 3rd day of November, 2006, the orders of the Court of Common Pleas of York County, dated September 2, 2005, at Nos. 2003–SU–002721–Y08, 2003–SU–002722–Y08 and 2003–SU–002723–Y08, are affirmed (Nos. 2035 C.D. 2005, 2036 C.D. 2005 and 2038 C.D. 2005). The orders dated September 16, 2005, where the trial court denied reconsideration are unappealable and stricken (Nos. 2033 C.D. 2005, 2034 C.D. 2005 and 2037 C.D. 2005). Landowner's petition for additional evidence is unappealable and stricken (No. 2119 C.D. 2005).